THE PAUL GILLRIE INSTITUTE,
INC., Paul Gillrie, and John
Darmento, Appellants,

v.

UNIVERSAL COMPUTER CONSULT-
ING, LTD. and Dealer Computer
Services, Inc., Appellees.

No. 01–04–01213–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 8, 2005.

Rehearing Overruled Feb. 21, 2006.

and John Darmento bring this accelerated interlocutory appeal challenging the trial court's order denying their special appearance.[1] In their sole issue, appellants contend that the trial court erred in determining that they were subject to the personal jurisdiction of a Texas court. We affirm.

## Factual and Procedural Background

Appellees, Universal Computer Consulting, Ltd. and Dealer Computer Services, Inc. (collectively, "UCS"), are affiliated companies that provide computer systems to automobile dealerships across the United States. PGI is described as "North America's leading consultant and advocate for automobile dealers in their quest to reduce technology expense in their dealerships." Gillrie is the founder of PGI, and both Gillrie and Darmento are directors and employees of PGI. PGI serves a "diverse client base of dealers, CPA firms and attorneys throughout the United States and Canada," and publishes a trade publication titled "the Journal of Dealership Computing," six times a year. In its June 2004 journal, which was edited by Darmento, PGI published an article revealing the results of a survey comparing vendors of car-dealership computer systems. The article stated that although "UCS received the highest ratings as each one of their products was scored," UCS received the lowest scores when customers were asked "to rate the company as a whole." The article characterized the results of the survey to indicate that customers liked UCS's products but did not like the company. The journal also contained a headline that stated, in bold, "Survey Shows UCS Clients Want to Leave." Under this headline, the article asserted that 71% of UCS's customers, if they had the choice, would not sign up with UCS again, and

Donald W. Gould, II, Johnson, Finkel, DeLuca & Kennedy, Mark Allen Counts, Johnson Deluca Kennedy & Kurisky, Houston, Jennifer S. Stoddard, James D. Blume, Blume & Stoddard, Dallas, TX, for Appellant.

Rebecca Michelle Moughon, John C. Allen, John C. Allen, P.C., Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

In this libel suit, appellants, the Paul Gillrie Institute, Inc. ("PGI"), Paul Gillrie,

---

1. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(7) (Vernon Supp.2005).

that, as a whole, more UCS customers were dissatisfied with their computer vendor than customers of any other vendor. Finally, the journal contained several graphs illustrating that UCS received the highest marks in numerous categories, but received the lowest "overall rating" among the rated computer vendors.

Robert Nalley, president of UCS, testified that, in the summer of 2004, he was contacted by Dan Chernault, vice president and chief financial officer of Russell Smith Ford ("Russell Smith"), a UCS customer located in Harris County, Texas. Chernault notified him of the articles contained in PGI's June 2004 journal. Nalley reviewed the journal and concluded that the statements contained in the journal were defamatory and damaging to UCS's reputation. Nalley stated that he interpreted the article to represent that it was based on a fair, impartial, and scientifically valid survey.

UCS also presented the affidavit testimony of Chernault, who stated that he is the vice president and chief financial officer of Russell Smith, located in Houston, Texas, he received a copy of PGI's June 2004 journal, he regarded the statements in the journal to be damaging to UCS's reputation and derogatory toward UCS, and the article caused him concern about UCS's services. Chernault also stated that he interpreted the article to represent that it was based on a fair, impartial, and scientifically valid survey.

In September 2004, UCS filed suit against appellants for libel, libel per se, business disparagement, tortious interfer-

ence with existing contracts, and tortious interference with prospective contractual relationships. In its petition, UCS alleged that the article contained in PGI's June 2004 journal was a sham, as evidenced by PGI's refusal to reveal the data upon which the article was based. UCS further alleged that the sham study was motivated by the fact that UCS had recently discredited and embarrassed Gillrie when it pursued a *Daubert*[2] motion against him in unrelated litigation. UCS brought suit against PGI, and against Gillrie and Darmento individually, alleging that they drafted and edited the articles at issue. Appellants filed a special appearance[3] and an answer, subject to their special appearance, generally denying UCS's allegations.

The relevant facts are largely undisputed. UCS maintains its corporate headquarters and principal place of business in Harris County, Texas. PGI is a Florida corporation; it does not maintain an office in Texas, does not have a registered agent for service of process in Texas, does not have any employees or operations located in Texas, and does not routinely send employees to Texas or recruit employees from Texas. However, PGI employees occasionally make and receive telephone calls from prospective clients in Texas. PGI's journal is "written, compiled, and published in Florida," and is sent to Texas through the United States mail. PGI has approximately eighteen active subscribers and thirty non-paying subscribers who are located in Texas and who receive the journal.[4] At least two of the Texas-based paid subscribers are current customers of UCS.

**2.** *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**3.** A party may appear specially, without making a general appearance, in order to object to the court's exercise of jurisdiction over it, on the ground that the party is not amenable

to process issued by the courts of this State. Tex.R. Civ. P. 120a.

**4.** It is not entirely clear from the record whether each subscriber receives multiple copies of the newsletter, and whether some of these subscribers furnish their customers with

Darmento, the editor of the PGI journal at issue, testified that he is a resident of Florida and that he has not been to Texas since 1990. Darmento also testified that Gillrie is a resident of Florida, that Gillrie traveled to Galveston, Texas in June 2004 to speak at a seminar on behalf of PGI, and that Gillrie travels to Texas once a year for similar seminars.

## Standard of Review

 The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). The burden of proof then shifts to the nonresident to negate all possible grounds for personal jurisdiction. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). The existence of personal jurisdiction is a question of law, which must sometimes be preceded by the resolution of underlying factual disputes. *Preussag Aktiengesellschaft v. Coleman,* 16 S.W.3d 110, 113 (Tex. App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.). When the underlying facts are undisputed or otherwise established, we review a trial court's denial of a special appearance de novo. *Id.* Where a trial court does not issue findings of fact or conclusions of law with its special appearance ruling, all fact findings necessary to support the judgment and supported by the evidence are implied. *BMC Software Belgium, N.V.,* 83 S.W.3d at 789.

## Discussion

In their sole issue, appellants argue that the trial court erred in determining that

they are subject to the personal jurisdiction of a Texas court because (1) they have no significant contacts with Texas; (2) they do not have continuous and systematic contacts with Texas and cannot be subject to the general jurisdiction of a Texas court; (3) the "fiduciary shield" doctrine protects Gillrie and Darmento from the general jurisdiction of a Texas court; (4) they are not subject to the specific jurisdiction of a Texas court; and (5) the exercise of jurisdiction over them would violate traditional notions of fair play and substantial justice.

 A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Fourteenth Amendment's due process clause and the Texas long-arm statute are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997); *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996) (orig.proceeding). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042. A nonresident "does business" in Texas if he, among other things, "commits a tort in whole or in part" in Texas. *Id.*[5] The Texas Supreme Court has repeatedly interpreted this statutory language "to reach as far as the federal constitutional requirements of due process will allow." *CSR Ltd.,* 925 S.W.2d at 594 (citations omitted). Therefore, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *Id.*

copies of the newsletter or use the information in the newsletter to assist their customers.

**5.** The Texas Supreme Court has recently noted that "[a]llegations that a tort was committed in Texas satisfy the Texas Long–Arm Statute, but not necessarily the U.S. Constitution." *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 788 (Tex.2005).

The United States Constitution permits a state to assert personal jurisdiction over a nonresident defendant only if the defendant has some minimum, purposeful contacts with the state and if the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson–Austin v. Austin,* 968 S.W.2d 319, 326 (Tex.1998). A nonresident who has purposefully availed himself of the privileges and benefits of conducting business in the state has sufficient contacts with the state to confer personal jurisdiction. *CSR Ltd.,* 925 S.W.2d at 594.

The "purposeful availment" requirement has recently been characterized by the Texas Supreme Court as the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). In *Michiana,* the Texas Supreme Court articulated three important aspects of the purposeful availment inquiry. *Id.* at 785. First, only the defendant's contacts with the forum count. *Id.* This ensures that a defendant is not haled into a jurisdiction solely by the unilateral activities of a third party. *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985)). Second, the acts relied on must be purposeful; a defendant may not be haled into a jurisdiction solely based on contacts that are "random, isolated, or fortuitous." *Id.* (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)). Third, a defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" because "[j]urisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Id.*

(citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)).

A defendant's contacts with a forum can give rise to either general or specific jurisdiction. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 227 (Tex. 1991). UCS concedes that this case is one of specific jurisdiction.[6] Specific jurisdiction is established if a defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *Id.* at 228. The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant that create a substantial connection with the forum state. *Id.* at 226. The substantial connection between the nonresident defendant and the forum state necessary for a finding of minimum contacts must come about by action or by conduct of the nonresident defendant purposefully directed toward the forum state. *Id.*

Although it is not determinative, foreseeability is an important consideration in deciding whether the nonresident has purposefully established minimum contacts with the forum state. *Id.* at 227. The concept of foreseeability is implicit in the requirement that there be a substantial connection between the nonresident defendant and Texas arising from actions or conduct of the nonresident defendant purposefully directed toward Texas. *Id.*

### Minimum Contacts

In the instant case, PGI published an article that allegedly defamed UCS, a

---

**6.** Accordingly, we need not address appellants' arguments concerning general jurisdiction.

corporation with its headquarters and principal place of business in Harris County, Texas; PGI mailed this journal to subscribers across the country, including approximately fifty subscribers located in Texas. Eighteen of the Texas subscribers were paid subscribers, while the other thirty Texas subscribers were non-paid. At least two of the Texas-based paid subscribers are customers of UCS, and at least one of UCS's current and long-time customers, located in Houston, contacted UCS after receiving the article and expressed concern about UCS's services. Furthermore, the article was contained in a trade journal targeted at those involved in or related to the automobile industry, and all of the subscribers, including those located both inside and outside of Texas, could have been considered as potential customers or industry contacts.

We find the facts in this case to be comparable to those in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and *Keeton*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790. In *Calder*, an entertainer residing in California brought suit in California against a nationally distributed magazine with a "large circulation," as well as the author and editor of an allegedly defamatory article published in that magazine. *Id.*, 465 U.S. at 785–86, 104 S.Ct. at 1484–85. The author and editor, both residents of Florida, objected to the jurisdiction of the California court. *Id.* The record established that approximately 600,000 copies of the magazine were circulated in California, out of a total circulation of 5 million. *Id.*, 465 U.S. at 785, 104 S.Ct. at 1484. Finding that "the allegedly libelous story concerned the California activities of a California resident" and that California was "the focal point both of the story and the harm suffered," the Supreme Court held that jurisdiction over the editor and author in California was proper "based on the effects of their

Florida conduct in California." *Id.*, 465 U.S. at 788–89, 104 S.Ct. at 1486–87. In support of its holding, the Supreme Court noted that the defendants wrote and edited an article that they knew would have a potentially devastating impact upon the entertainer in California, and that the defendants should "reasonably anticipate" being haled into court in California. *Id.*, 465 U.S. at 789–90, 104 S.Ct. at 1487. Similarly, in *Keeton*, a resident of New York brought suit for libel in New Hampshire against a magazine with its principal place of business in California for publishing allegedly defamatory statements. *Id.*, 465 U.S. at 772, 104 S.Ct. at 1477. Noting that the regular monthly sales of thousands of magazines in New Hampshire could not be characterized as "random, isolated, or fortuitous," the Supreme Court held that such circulation in the forum state was sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine. *Id.*, 465 U.S. at 773–74, 104 S.Ct. at 1478.

Appellants argue that *Calder* is inapplicable because the alleged defamation "has absolutely no connection to the State of Texas," the journal does not specifically mention the State of Texas, there was no evidence to show that UCS's operations were centered in Texas, and there was no evidence that the journal was aimed at Texas or widely circulated in Texas. Here, however, PGI's allegedly defamatory statements were contained in its trade journal that it sent to approximately fifty customers located in Texas. Moreover, the allegedly defamatory statements concerned UCS, a corporation with its headquarters and principal place of business in Texas.

In regard to appellants' attempts to distinguish *Keeton*, we recognize that the circulation of the magazine in *Keeton* was much more substantial than the circulation

of the PGI journal. More importantly, however, the PGI journal is a trade publication with a limited audience targeted to a specific industry, and it is neither surprising nor determinative that the PGI journal has a more limited circulation than that of a nationwide magazine marketed to the general populace.[7] We also note that the record is void of any evidence related to the number of subscribers to the PGI journal, the location of these subscribers, the percentage of subscribers who reside in Texas versus those who reside in other states, the location of the subscribers who responded to the survey and provided the underlying data for the survey, and the exact number of copies sent to the Texas subscribers. To the extent appellants are attempting to bolster their jurisdictional challenge with these facts, they have failed to provide any evidentiary support.

Appellants cite to several cases for the proposition that merely mailing documents into a state is insufficient to become subject to the jurisdiction of that state's courts. These cases are easily distinguishable. For example, appellants cite the Texas Supreme Court's statement in *National Industrial Sand Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex.1995), that "[a]n organization that mails national newsletters and notices of acceptance of dues to a member company in Texas has not purposefully established minimum contacts such that it could reasonably foresee being sued in the courts of this State." However, this statement was made in the context of a general jurisdiction analysis, and has no application to the facts supporting the exercise of specific jurisdiction in this case. Another case cited by appellants, *U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d

760, 763 (Tex.1977), involved a contract dispute over a contract that was "solicited, negotiated, and consummated" in Oklahoma. In determining that the nonresident in that case had not purposefully conducted activities within Texas, the supreme court noted that the nonresident was merely "a passive customer of a Texas corporation who neither sought, initiated, nor profited from his single and fortuitous contact with Texas." *Id.* The holding in *U–Anchor* does not support appellants' challenge to the jurisdiction of a Texas court to hear UCS's libel claims.

Appellants also cite *Revell v. Lidov*, 317 F.3d 467 (5th Cir.2002), to support their argument that there is no jurisdiction because the publication was not "directed specifically at Texas." Like the other cases cited by appellants, *Revell* is distinguishable. In *Revell*, the Fifth Circuit held that an article posted on a website bulletin board was "presumably directed at the entire world, or perhaps just concerned U.S. citizens," but "certainly was not directed specifically at Texas." *Id.* at 475. Here, appellants directed copies of their journal, which allegedly contained an article defaming a corporation with its headquarters and principal place of business in Texas, to fifty subscribers located in Texas, as well as to an unknown number of subscribers across the country.

In support of their special appearance, appellants also refer to *Michiana*, 168 S.W.3d at 777. In *Michiana*, a Texas resident bought a recreational vehicle from a nonresident seller, and brought suit against the seller for an alleged misrepresentation made during a phone call initiated by the buyer. *Id.* at 781, 784. The seller, a separate legal entity from the

---

7. Appellants argue that the PGI journal "is available to and read only by a limited number of persons and is not generally available to the public at large." Rather than defeat

the exercise of jurisdiction, we find that this fact actually supports the exercise of jurisdiction in this case.

manufacturer, was located in Indiana, did not have employees or property in Texas, was not authorized to do business in Texas, did not advertise in Texas or on the Internet, and did not solicit business from the purchaser or from anyone else in Texas. *Id.* at 784. The supreme court addressed the question of whether suit could be brought in Texas against the seller based on its alleged misrepresentation in this single, unsolicited telephone call. *Id.* The supreme court held that "because [the seller's] only contact with Texas was [the buyer's] decision to place his order from [Texas]," the seller was not subject to the jurisdiction of a Texas court. *Id.* at 794. Here, unlike in *Michiana,* the exercise of jurisdiction over PGI, a nonresident, is consistent with the touchstone of purposeful availment. PGI is subject to the jurisdiction of Texas courts, not because of the unilateral activity of a third party, but because of its purposeful contacts with Texas. Additionally, PGI's mailing of the journal to Texas subscribers is not "random, isolated, or fortuitous." Finally, by directing the trade journal to Texas subscribers, PGI was seeking a "benefit, advantage, or profit," and, thus, consented to being sued in Texas for allegedly defamatory statements contained in the journal.[8]

As to the special appearances filed on behalf of Darmento and Gillrie individual-ly, they contend that the trial court erred in denying their special appearances because UCS's cause of action did not arise out of or relate to their Texas contacts. UCS asserts, with evidentiary support, that Gillrie and Darmento drafted and edited the articles contained in PGI's journal. In *Calder,* the Supreme Court stated

> Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually. In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.

*Id.,* 465 U.S. at 790, 104 S.Ct. at 1487 (citations omitted). Similarly, UCS is alleging that Gillrie and Darmento are primary participants in tortious conduct directed at it, and UCS is seeking to hold them individually liable for their role in publishing allegedly defamatory statements in a trade article directed by PGI to at least fifty subscribers located in Texas about UCS, a corporation with its headquarters and principal place of business in Texas.[9]

---

8. In the journal, PGI listed its "services offered," including "computer negotiating," "resolution of dealer-vendor disputes," and "computer expense reduction," and PGI further offered "to review any billing or proposal for free." Additionally, the journal included an article titled "Be Wary of New Release," which stated that "UCS is releasing another update," warned dealers that they would be "obligated to update hardware," and suggested that dealers send PGI their deals for review because "the upgrade is an excellent opportunity to negotiate new terms and prices."

9. Appellants' arguments concerning the fiduciary shield doctrine were limited to the issue of general jurisdiction, which we do not address here. We also note that this Court has previously held that the fiduciary shield doctrine does not protect a corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable. *See Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 250 & n. 9 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *see also Ennis v. Loiseau,* 164 S.W.3d 698, 706–07 (Tex.App.-Austin 2005, no pet.); *SITQ E.U., Inc. v. Reata Rests., Inc.,* 111

Here, there is a direct relationship between appellants, their purposeful contacts with subscribers located in Texas, and UCS's claims arising out of alleged defamatory statements made in PGI's journal. Accordingly, we hold that appellants have established sufficient minimum contacts with Texas to subject them to personal jurisdiction.

### Traditional Notions of Fair Play and Substantial Justice

The exercise of personal jurisdiction over a nonresident defendant must also comport with traditional notions of "fair play and substantial justice." *Guardian Royal,* 815 S.W.2d at 228. The burden is on the defendant to present a compelling case that the presence of some other considerations renders the exercise of jurisdiction unreasonable. *Id.* at 231 (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185). In making a determination, a court generally must look to the following factors: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.* at 228, 231. Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when a nonresident defendant has purposefully established minimum contacts with the forum state. *Id.* at 231. Furthermore, distance from the forum is generally not sufficient to defeat jurisdiction because the availability of "modern transportation and communication have made it less burdensome for a party sued to defend himself in a state where he engages in economic activity." *McGee v. Int'l Life*

*Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

Here, appellants contend that "the difficulties attendant in calling [them] across state borders to defend themselves in this lawsuit are onerous." Appellants note that none of the records, files, or witnesses necessary for trial are located in Texas. Appellants also assert that Texas has no interest in adjudicating this case and that, because UCS has the financial resources and ability to seek relief in Florida, it should do so. However, the fact remains that UCS employees and customers, who would likely be called as witnesses in this case, are located in Texas and that UCS documents, which would likely be produced in discovery, may be located in Texas. Furthermore, although it appears that defending this suit in Texas might necessitate unwelcome travel and expense for appellants, these factors alone are not determinative. *See Guardian Royal,* 815 S.W.2d at 231. Certainly, prosecution of this suit in Florida would involve similar inconveniences for UCS. However, "there is no legal requirement that this hardship must be borne instead by the plaintiff whenever the defendant is not found in the state of the plaintiff's residence." *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 253–54 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). Finally, contrary to appellants' assertion, Texas does have an interest in providing its citizens with a forum to adjudicate claims against citizens of other states who committed tortious acts against its residents. *See Guardian Royal,* 815 S.W.2d at 232 (recognizing that interests of forum state and plaintiff frequently will justify severe burden placed upon nonresident defendant). Thus, we hold that the exercise of personal jurisdiction over appellants in this case comports

S.W.3d 638, 651 (Tex.App.-Fort Worth 2003, pet. denied).

with traditional notions of fair play and substantial justice.

Accordingly, because the record indicates that appellants' contacts with Texas are sufficient to create specific jurisdiction over them and because the exercise of personal jurisdiction over appellants comports with traditional notions of fair play and substantial justice, we further hold that the trial court did not err in denying appellants' special appearance.

We overrule appellants' sole issue.

## Conclusion

We affirm the order of the trial court.