

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00034-CV

_____

MICHAEL CAGLE AND MARTIN LAKE CONSTRUCTION, INC., Appellants

V.

TIMOTHY J. CLARK, Appellee

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2009-187

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

# O P I N I O N

Michael Cagle and Martin Lake Construction, Inc. (MLC) appeal the grant of a special appearance in favor of Timothy J. Clark, a resident of the state of New York. Because we agree with Cagle and MLC's arguments that the trial court had specific *in personam* jurisdiction over Clark, we reverse the court's judgment and remand to the trial court for further proceedings.[1]

## I.     Factual and Procedural History

Cagle owned MLC, a Texas corporation that "did oil and gas work, as well as construction work in the lignite mines and power plants." MLC routinely bid on jobs requiring "preliminary work," such as building "roads and pads," and laying pipeline. Eventually, MLC began to run out of operating capital, which limited the number of bids it could make. Cagle "was approached . . . by several individuals," including Clark, about the possibility of a sale of MLC.

Cagle testified that Clark "actually just called one day and introduced himself and told me a little about himself and wanted to just come down and set up a meeting." Pervis Eugene Young, operations manager for MLC since 2004, testified that it was his understanding that Clark, who lived in New York, was going to buy MLC. A meeting was scheduled, and Clark alone made a personal appearance to the Carthage facility two weeks after the telephone conversation with Cagle. During the meeting, Cagle told "him that we had . . . reached our maximum as far as funding on our own." Clark responded by presenting "several case scenarios

---

[1] MLC and Cagle do not argue that Clark's contacts with Texas would give rise to general jurisdiction.

where he owned other companies in Texas and they had grown from this revenue base to other revenue base."[2]

This led to a business proposal with the goal of growing MLC's existing business. Specifically: (1) a new entity called Martin Lake Energy Services, LLC (MLES) would be formed "for the purpose of acquiring the assets of the business formerly conducted under the name of [MLC]," (2) Cagle would agree to sell MLC's assets, (3) MLC would receive $6,800,000.00, (4) Clark would obtain financing to expand operations, (5) Cagle would receive a twenty percent interest in the new MLES entity, (6) Clark would be Chairman of the MLES Board, and (7) MLES would continue to do business, primarily in Texas. This strategy would allow an infusion of capital into the new MLES entity to provide for company growth. According to Cagle, he would manage the day-to-day operations of MLES in the same manner as he did with MLC, and Clark would take over the financial management of the company. Cagle testified that once a tentative agreement was reached in June 2007, he hired accountants and attorneys to assist him in arriving at a "desired result" in the sale.

Cagle stated that he met Clark several times to conduct business in a Fort Worth office and that they had many meetings and conversations prior to the MLC sale. Cagle testified that negotiations of the sale were all conducted by Clark and that he spoke to Clark "two or three times a week, if not more" "[f]or a period of time." Young testified that he met Clark personally in Carthage either "right before or right after" the Asset Purchase Agreement was executed. After MLES' formation, the sale of MLC to MLES, conducted via an Asset Purchase

---

[2]According to Cagle, Clark owned "Premier Pipeline Company in Fort Worth," "two salt water companies; one in Houston, one in Odessa," "a rig-moving company in Midland," and another company which Cagle could not recall.

3

Agreement, was completed September 1, 2007. Cagle was named the president of MLES. Clark was not at the closing.

Cagle testified that he believed he was dealing individually with Clark until "we finally agreed on the deal and he began to . . . file for licensing and all." Clark accomplished the goal of obtaining additional financing through a revolving credit facility issued by FCC, LLC, d/b/a First Capital (FCC), a Florida limited liability company that was "in the business of providing operating capital for businesses through credit facility agreements."[3] The FCC Loan and Security Agreement was signed by Clark as the Chairman of the Board. The MLES Board also included Vice President Marcia McKillop, Controller Eric Niemeyer, and a Chief Financial Officer (CFO) allegedly hired by Clark.

After MLES' formation, Cagle testified that Clark came to Texas to conduct MLES business on several occasions. Young testified that he met with Clark and was hired by him to work for MLES. Young also stated that Clark returned "[f]our or five" times to MLES' offices in Carthage. During one visit, Young recalled that Clark and Cagle "had one meeting there that he was present about expansion. The one meeting was about growth, to grow the company." According to Young, Clark "was supposed to furnish us with another million dollars for growth." The aim "was to move and put a yard in [] Arkansas. . . . he wanted to expand and grow in that area in Arkansas, mainly in the pipeline division."

---

[3]Cagle testified that the $6,800,000.00 was a loan from FCC which was "dispersed" to pay off debt. However, the maximum line amount for the credit facility was $3,500,000.00. The trial court found that "MLC and/or Cagle received all of the $6,800,000.00 purchase price."

Cagle explained:

> [Clark] wanted to go and grow [the business] in the Fayetteville shale in Arkansas, as well as a large pipeline division in Dubach, Louisiana. And there was actually a bid meeting the next morning in Fayetteville, Arkansas over several different jobs.
>
> And we asked him then, "How soon do you want to start?" And he said, "How soon do we need to be there?" And [Young] made him aware that, hey, there's a meeting in the morning and someone could [g]et several jobs. And he said, "I want to be present in that meeting." And he said, "I will have the funding that you need within the next couple of weeks."

Based on these representations, Cagle testified that MLES won bids for several projects. However, additional operating funding did not arrive. Therefore, MLES "stole out of accounts receivable that was coming through . . . the Carthage area that were actually eartagged to pay Carthage's bills and keep those accounts payable done. We would -- we just kept borrowing from that slush pool until it basically ran it dry." In other words, Cagle said MLES was robbing Peter to pay Paul, resulting in a default of the FCC loan. The expenses of the bid job and money used to purchase equipment led to cash being "tight."

According to Cagle, employees were unable to be paid on "four or five" occasions, and "funds could not be transferred without the approval of Tim Clark." Cagle stated, "Tim was calling the shots weekly on who got paid and how much and when they got paid. And a lot of times, he would skip vendors and pay -- a lot of times, he would pay his attorney." Eventually, MLES defaulted on the FCC note.

To secure its loan in the form of a revolving credit facility to MLES, FCC had taken a first priority lien and security interest in all of MLES' collateral. When MLES defaulted by failing to make payment in accordance with the terms of the credit facility, FCC filed a verified

5

petition against MLES, along with an unopposed request for the emergency appointment of a receiver of MLES' assets.[4]

MLC and Cagle intervened. Their second amended petition in intervention and second amended original petition (petition) was filed against MLES and Clark, in his individual capacity.[5] The petition alleged that "Clark induced Cagle to give up a going business" and that Clark breached the contract, promises, and representations made to Cagle the he would continue to obtain additional funding for MLES.[6] During the course of the litigation, FCC obtained receivership and auctioned MLES' assets. The petition blamed Clark for mismanaging the company and allowing MLES "to become in default on the loan with" FCC.

The petition noted that Clark lived in New York and was not a named owner of MLES. Yet, it alleged that Clark "owned or controlled" TJC Investments, LLC (TJC), a limited liability company that owned MLES. TJC "does not hold a permit to do business in Texas and is not registered with the Texas Secretary of State." However, Cagle asserted that the court had personal jurisdiction over Clark because "Clark was using the various LLCs as shams and those LLCs are the defendants' alter egos."[7] Cagle also contended that Clark purposely conducted business in Texas and was physically present in Texas.

---

[4]MLES and FCC are not a party to this appeal.

[5]The trial court found that Clark was "the Chairman of the Board of" MLES.

[6]After the formation of MLES, Cagle understood that representations made by Clark were made in some official capacity.

[7]As explained below, we need not decide issues related to alter ego.

6

Clark filed a special appearance accompanied by an affidavit which asserted:

(1)     I am not a resident of the State of Texas, and I am not required to maintain, nor do I maintain, a registered agent for service in Texas. I am a resident of the State of New York.

(2)     I do not maintain a place of business in Texas, and I do not personally have any employees, servants, or agents within the State of Texas.

(3)     I do not own any real property in the State of Texas, nor do I own any tangible property in the State of Texas.[8]

(5)     I did not expect to be haled to Court in the State of Texas. If I am required to appear in this matter in Panola County, Texas, I will incur substantial expenses for travel, lodging and meals while away from home.

(6)     At all times relevant hereto, I was the Chairman of the Board of [MLES]. On or about July 16, 2007, MLES entered into that certain Asset Purchase Agreement with [MLC and Cagle] in which MLES agreed to purchase the assets of MLC for $6,800,000, along with a subordinated promissory note in the amount of $2,850,000 (the "Note") and the issuance of 20% of the ownership interest in MLES. MLC and/or Cagle received the $6,800,000 purchase price.

(7)     The Asset Purchase Agreement between MLES on the one hand, and MLC and Cagle, on the other hand, was negotiated and executed by me while I was in the State of New York . . . .

. . . .

(9)     Article 4 . . . of the Asset Purchase Agreement states that "there are no representations, warranties, understandings or agreements other than those expressly set forth herein . . . . except as modified in writing concurrently herewith or subsequently hereto . . . .

(10)     I am not a party to the Asset Purchase Agreement. Indeed, I am not a party to any contract with MLC and/or Cagle. I have never entered into any contract, in my individual capacity, with MLC and/or Cagle. All business transactions were by and between MLES and MLC and/or Cagle. All acts undertaken by me in connection with MLES were in my capacity as Chairman of the Board for MLES.

_____

[8]The affidavit does not contain a paragraph 4.

(11) I have never personally paid any of MLES' corporate debts with my personal assets, and I did not commingle MLES' corporate assets or funds with my personal assets or funds. Additionally, I have never represented that I would financially back MLES, nor did I financially back MLES at any time. I did not personally guarantee any of MLES' corporate debts. Indeed, MLES obtained third party financing from FCC, LLC d/b/a First Capital to fund a portion of the purchase price.

(12) Additionally, I did not divert any of the MLES's [sic] profits to myself for personal use, and I always kept personal and corporate assets separate at all times. I had no check writing privileges for MLES, and I never wrote checks on behalf of MLES.

(13) Furthermore, Cagle was the president of MLES at all times relevant hereto. In his capacity as president of MLES, on or about August 31, 2007, Cagle entered into that certain Management Agreement with ESCP Management Services, LLC ("ESCP") (the "Management Agreement"). I was the president of ESCP and executed the Management Agreement in my capacity as president of ESCP.

. . . .

(15) ESCP was never paid any fees under the Management Agreement. ESCP never received any payment, in the form of cash or otherwise, from MLES. . . .

During cross-examination, Young testified that he was not aware of any contract which Clark signed in his individual capacity.

In response to the special appearance, Cagle attached Clark's responses to requests for admissions, in which Clark admitted that he met with Cagle in Panola County, Texas, in 2007 and 2008. Cagle asserted that these meetings were conducted for the purpose of expanding MLC's business and argued that the trial court had specific jurisdiction over Clark.

A hearing on the special appearance, in which Clark did not personally appear, was conducted. The trial court accepted Clark's affidavit into evidence, along with the Asset

8

Purchase Agreement and Management Agreement. The trial court granted Clark's special appearance and issued findings of fact and conclusions of law which recited much of Clark's affidavit, and added that the Management Agreement entered into by Cagle and Clark with ESCP demonstrated that "management activities on the part of Defendant Clark were performed through ESCP, not by Defendant Clark individually."

With respect to findings of fact, the trial court found that jurisdiction over Clark could not be established in his individual capacity for breach of contract because he did not execute any contract in his individual capacity. Because Clark only owed fiduciary duties to the corporation and MLES did not sue Clark, Clark did not owe fiduciary duties individually to MLC or Cagle, and jurisdiction could not be asserted over Clark based on the alleged breach of fiduciary duties. Similar reasoning was applied in rejection of the exercise of jurisdiction based on negligent mismanagement claims. The trial court cited to the fiduciary shield doctrine stating, "Jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual." Finding no evidence that MLES was Clark's alter ego, the court found that the fiduciary shield doctrine prevented it from exercising personal jurisdiction over Clark. With respect to fraud claims stemming from Clark's alleged representations that he would obtain funding necessary to cover operating expenses, the court found that any representations made prior to MLES' formation were governed by the Merger Clause in the Asset Purchase Agreement. With respect to representations made after MLES' formation, the court found that they "[were] not made as a statement of fact."

9

The trial court declined to exercise personal jurisdiction over Clark in his individual capacity. It granted the special appearance, dismissed claims against Clark, and severed the matter, providing finality for the purpose of appeal.

## II. Standard of Review

"The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *Stelly v. Tarr*, 344 S.W.3d 26, 29 (Tex. App.—Texarkana 2011, no pet.) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980); *Int'l Shoe Co. v. State of Washington*, *Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945)). In this suit against nonresident defendant Clark, the initial burden of proof to plead sufficient allegations to bring him within the provisions of the Texas long-arm statute was upon MLC and Cagle. *Motor Car Classics*, *LLC v. Abbott*, 316 S.W.3d 223, 229 (Tex. App.—Texarkana 2010, no pet.) (citing *Kelly v. Gen. Interior Constr.*, *Inc.*, 301 S.W.3d 653, 658 (Tex. 2010)). If MLC and Cagle met this pleading burden, the burden of proof shifted to Clark, who was required to negate all possible grounds for personal jurisdiction alleged. *Id.*; *BMC Software Belgium*, *N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). Personal jurisdiction is a question of law, which we review de novo. *Abbott*, 316 S.W.3d at 229–30 (citing *Retamco Operating*, *Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009)); *Milacron Inc. v. Performance Rail Tie*, *L.P.*, 262 S.W.3d 872, 875 (Tex. App.—Texarkana 2008, no pet.).

In resolving this question of law, a trial court must often resolve questions of fact. *Abbott*, 316 S.W.3d at 230 (citing *Am. Type Culture Collection*, *Inc. v. Coleman*, 83 S.W.3d 801,

10

805–06 (Tex. 2002)); *Milacron*, 262 S.W.3d at 875. We consider all of the jurisdictional evidence before the trial court. *Townsend v. Univ. Hosp.–Univ. of Colo.*, 83 S.W.3d 913, 919 (Tex. App.—Texarkana 2002, pet. denied). Our courts of appeals may review the fact-findings for both legal and factual sufficiency. *Abbott*, 316 S.W.3d at 230 (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996)). However, we review de novo the trial court's legal conclusions. *Id.* (citing *BMC*, 83 S.W.3d at 794); *Milacron*, 262 S.W.3d at 875.

### III. While Sufficient Evidence Supported a Majority of the Trial Court's Findings of Fact, the Findings Did Not Relate to Jurisdictional Contacts Made Prior to MLES' Formation

Cagle and MLC appeal, alleging that the trial court's findings of fact, numbers 10–14 and 20–39, are not supported by legally and factually sufficient evidence.[9] Their brief mistakenly states that "[t]he Asset Purchase Agreement was never offered into evidence" and that "[n]o exhibits are included in the reporter's record nor in the clerk's record, except the attachment to Clark's special appearance and the Request for Admissions attached to the Response of Intervenors." In fact, the Asset Purchase Agreement, Clark's supplemental affidavit, and the Management Agreement referred to above were included in a supplemental clerk's record, and the court took judicial notice of these exhibits during the hearing on the special appearance. Further, the trial court made reference to these exhibits in its findings of fact and conclusions of law. For clarity, we discuss the findings of fact in turn.

Finding number 10, stating that Clark was Chairman of the Board of MLES at all relevant times, was not supported by the evidence as explained in Section V of this opinion because Clark

---

[9]MLC and Cagle's brief recite agreement or "no quarrel" with the remaining findings of fact.

11

could not have been the Chairman prior to MLES' formation, which is the time period most relevant to the jurisdictional analysis. A quick comparison of the findings of facts 11–14 establish that they were derived from paragraphs 6 and 7 of Clark's supplemental affidavit, which was judicially noticed at the hearing. These findings relate to the entry of MLES into the Asset Purchase Agreement, the negotiation of the Agreement by Clark in New York, the signing of the Agreement by Clark in his capacity as Chairman of the Board of MLES, and the payment of $6,800,000.00 to Cagle. While supported by the evidence, these facts do not bear upon the jurisdictional question at issue—whether Clark's contacts with Texas prior to the formation of MLES gave rise to personal jurisdiction in Texas.

Findings 20 and 21, discussing business dealings and stating that all acts were conducted by Clark in his capacity as Chairman of the Board of MLES are supported by the evidence only when considering dates after the formation of MLES. Findings of fact 22–36 directly correspond with paragraphs 10–15 of the supplemental affidavit. Finding number 24, stating that Clark did not represent that he personally would financially back MLES, addresses "directed-a-tort jurisdiction," which the Texas Supreme Court has noted "confuses the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005). As the court stated, "If purposeful availment depends on whether a tort was directed toward Texas, then a nonresident may defeat jurisdiction by proving there was no tort." *Id.* Here, however, the finding that Clark did not represent that he personally would financially back MLES does not negate all possible grounds for jurisdiction because it does not negate Cagle's assertion that Clark "failed to deliver upon promises and

12

representations made to Cagle in contemplation of doing business," i.e., that funding would be obtained by Clark by some method. Also, the Texas Supreme Court warned,

> Personal jurisdiction is a question of law for the court, even if it requires resolving questions of fact. But what if a judge and jury could disagree? May a trial judge effectively grant summary judgment in a local jurisdiction by deciding contested liability facts in favor of the defendant? And if a jury absolves a defendant of tort liability, is the judgment void because the court never had jurisdiction of the defendant in the first place?

> Business contacts are generally a matter of physical fact, while tort liability (especially in misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter.

*Id.* at 790–91 (footnotes omitted). Nevertheless, we conclude that the trial court's finding was supported by Clark's affidavit, although challenged by Cagle's testimony at the hearing.[10] *See Leesboro Corp. v. Hendrickson*, 322 S.W.3d 922, 930 (Tex. App.—Austin 2010, no pet.).

Findings 23 and 25–36 dealt with alter ego issues and were formulated based on representations in Clark's affidavit that were not contested in the hearing. Alter ego, however, is not the basis of personal jurisdiction in this case. Finding of fact 37, that "the only relationship between Defendant Clark and the Plaintiffs arose from the business dealings between the parties related to the purchase of MLC," was a finding made from Cagle's testimony and documentary evidence introduced after the formation of MLES. Finding 38, that MLC was a creditor of MLES and that Cagle was a creditor and minority shareholder, was made from the terms of the Asset Purchase Agreement. Finding of fact 39, reciting that "the Court admitted the Management Agreement[,]" which showed "management activities on the part of Defendant

---

[10]However, because we find below that the trial court had personal jurisdiction over Clark, the ultimate issue of whether Cagle personally represented that he would financially back MLES should be left to the trier of fact.

13

Clark were performed through ESCP," was taken from the judicially noticed Management Agreement. Again, these findings have no bearing on the import of Clark's contacts with the state of Texas prior to the formation of MLES.

Nevertheless, we conclude that the trial court's findings of fact, with the exception of finding 10, and the overbroad nature of findings 20 and 21, were supported by sufficient evidence.[11]

## IV.    The Law of Personal Jurisdiction

Personal jurisdiction refers to a court's power to bind a particular person or entity. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). A Texas court may exercise personal jurisdiction over a nonresident defendant to the extent authorized by state and federal due process standards and the Texas long-arm statute. *Stelly*, 344 S.W.3d at 29–30 (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990)). The Texas long-arm statute permits personal jurisdiction over a nonresident to reach "as far as the federal constitutional requirements of due process will allow." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). Federal due process is satisfied when (1) the defendant has minimum contacts with Texas and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *See Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009); *Stelly*, 344 S.W.3d at 30 (citing *Washington*, 326 U.S. at 316).

---

[11]We review de novo the trial court's conclusions of law related to personal jurisdiction. We will not review the numerous conclusions of law containing summary judgment-type findings entered by the trial court that are inappropriate at this stage in the proceedings.

Federal due process mandates that Clark "purposefully avail" himself of the privilege of conducting activity within the forum state, thus, invoking the benefits and protections of its laws. *Stelly*, 344 S.W.3d at 30 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76 (1985); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). This minimum contacts analysis protects Clark from being haled into court if his relationship with Texas is too attenuated to support jurisdiction. *Abbott*, 316 S.W.3d at 230 (citing *Schlobohm*, 784 S.W.2d at 357). Our long-arm statute allows Texas courts to exercise jurisdiction over foreign defendants who are "doing business" within the state. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2008); *CSR Ltd.*, 925 S.W.2d at 594 (Tex. 1996); *Kelly Inv.*, *Inc. v. Basic Capital Mgmt.*, *Inc.*, 85 S.W.3d 371, 374 (Tex. App.—Dallas 2002, no pet.). A nonresident does business in Texas if the nonresident (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in Texas, (2) commits a tort in whole or in part in Texas, or (3) recruits Texas residents for employment inside or outside Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. Here, the second option is at issue.

Clark's activities, whether they consisted of direct acts within Texas or conduct outside Texas, must justify a conclusion that he could reasonably anticipate being called into court in Texas. *Abbott*, 316 S.W.3d at 230 (citing *Woodson*, 444 U.S. at 297). It is the quality and nature of Clark's contacts, rather than their number, that are important to the minimum contacts analysis. *Id.* To meet purposeful availment, it is only Clark's contacts "with the forum that count: [because] purposeful availment 'ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person.'"

15

*Stelly*, 344 S.W.3d at 30 (quoting *Michiana*, 168 S.W.3d at 785; *Guardian Royal Exch. Assurance*, *Ltd. v. English China Clays*, *P.L.C*., 815 S.W.2d 223, 226 (Tex. 1991)). Second, the acts relied on cannot be "random, isolated, or fortuitous." *Id.* (citing *Michiana*, 168 S.W.3d at 785). "Third, a defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id*. (quoting *Michiana*, 168 S.W.3d at 785). "Jurisdiction is premised on notions of implied consent-that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Id.*

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *BMC*, 83 S.W.3d at 795. General jurisdiction is not at issue here. Specific jurisdiction is established if the nonresident defendant's liability arises out of or is related to an activity conducted within the forum. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007); *BMC*, 83 S.W.3d at 796; *Casas Grandes Confections*, *LLC v. Arbor*, 367 S.W.3d 872, 875 (Tex. App.—El Paso 2012, no pet.).

Again, "[w]hether a court has personal jurisdiction over a nonresident defendant is a question of law, which we review de novo." *Zinc Nacional*, *S.A. v. Bouche Trucking*, *Inc.*, 308 S.W.3d 395, 397 (Tex. 2010) (per curiam).

## V. The Fiduciary Shield Doctrine Does Not Apply

Clark argues that contacts made with Texas concerning MLES business after the formation of MLES occurred as a result of Clark's capacity as the Chairman of the Board of MLES and should not count toward the jurisdictional analysis. The trial court applied, and Clark relies on, the fiduciary shield doctrine to prevent the inclusion of contacts in his capacity as

Chairman of the MLES Board from contributing to the personal jurisdiction analysis. "The fiduciary shield doctrine protects a nonresident corporate officer or employee from the exercise of jurisdiction when all of his contacts with Texas were made on behalf of his employer." *Tabacinic v. Frazier*, 372 S.W.3d 658, 668 (Tex. App.—Dallas 2012, no pet.). However, as properly stated in *Tabacinic*, courts applying the fiduciary shield doctrine "have limited its application to attempts to exercise *general* jurisdiction over a nonresident defendant." *Id.* (citing *Crithfield v. Boothe*, 343 S.W.3d 274, 287 (Tex. App.—Dallas 2011, no pet.); *Brown v. Gen. Brick Sales Co.*, 39 S.W.3d 291, 300 (Tex. App.—Fort Worth 2001, no pet.); *Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)); *Cerbone v. Farb*, 225 S.W.3d 764, 769 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Barnhill v. Automated Shrimp Corp.*, 222 S.W.3d 756, 768–69 (Tex. App.—Waco 2007, no pet.).

"A corporate officer or employee is not shielded from the exercise of *specific* jurisdiction as to torts for which the officer or employee may be held individually liable." *Tabacinic*, 372 S.W.3d at 668 (citing *Gen. Elec. v. Brown & Ross Int'l Distribs.*, *Inc.*, 804 S.W.2d 527, 532–33 (Tex. App.—Houston [1st Dist.] 1990, writ denied)). "Corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation." *Id.* "Thus, a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct directed at the forum state for which he may be held personally liable." *Id.* at 668–69

17

(citing *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.)); *see Crithfield v. Boothe*, 343 S.W.3d 274, 287 (Tex. App.—Dallas 2011, no pet.).

Also, MLC and Cagle rely heavily on *Cappuccitti v. Gulf Industrial Products, Inc.*, 222 S.W.3d 468 (Tex. App.—Houston [1st Dist.] 2007, no pet.), in support of their argument that the fiduciary shield doctrine does not apply to contacts Clark made prior to the formation of MLES. A summary of the case is necessary to understand our sister court's holding. Gulf Industrial Products, Inc. (GIP) was a Texas corporation which manufactured and sold chemicals in Texas. *Id.* at 473–74. In 2002, Frank Cappuccitti, a general manager of the mining chemicals division of Cytec Industries and a New Jersey resident, called GIP founder Robert Kerley and expressed his interest in meeting. *Id.* at 474. Cappuccitti met with Kerley in Texas and told him that he was thinking of quitting his current job to form a new company to which GIP could sell its product. *Id.* The problem was that Cappuccitti had a noncompete clause in his employment contract with Cytec that prevented him from competing with Cytec in the United States. In exchange for this promise not to compete, Cytec would pay Cappuccitti $200,000.00, which Cappuccitti explained would be rolled into the new proposed corporation that he would incorporate outside of the United States.

As a result of other meetings in Texas, Kerley agreed to allow Cappuccitti to use GIP's trademarked name "Minerec" as the name of his new company. *Id.* The Minerec company and its parent company, CCC Holding, Inc., were formed in the Bahamas. *Id.* The name of CCC Holding was changed to Flottec, Inc. Cappuccitti was Flottec's sole shareholder and employee. *Id.* He was also the president of Minerec and one of only two employees of that company. *Id.*

18

Cappuccitti operated both companies from his home in New Jersey. *Id.* GIP was to be a sole manufacturer of certain products distributed by Minerec. *Id.* at 475. In exchange, GIP agreed to provide a $450,000.00 line of credit to Minerec as working capital. *Id.*

Once Minerec began doing business with GIP, Cappuccitti paid himself $10,000.00 per month in a consultant capacity. *Id.* He wrote a personal check on one occasion to pay a Minerec bill. *Id.* The check was drawn on an account Cappuccitti held in his individual capacity and had opened for the purpose of making loans to Minerec. *Id.* Once Cytec learned Cappuccitti was doing business with GIP, it terminated the contract and did not pay the $200,000.00. Cappuccitti did not contest the termination. GIP subsequently terminated its agreement with Minerec, and Cappuccitti then paid all of Minerec's obligations from his own pocket, except that he did not repay $393,342.32 Minerec owed to GIP under GIP's line of credit to Minerec or monies owed for product sold by GIP to Minerec. *Id.* at 476. Next, Cappuccitti transferred all of Minerec's assets to the parent company, leaving Minerec insolvent.

GIP sued Flottec and Cappuccitti individually, prompting the filing of a special appearance. The trial court denied the special appearance, and Cappuccitti and Flottec appealed. Cappuccitti argued that his actions were conducted only in his capacity as a corporate representative of Minerec and that he was thus protected by the Texas fiduciary shield doctrine. *Id.* at 480. It was also argued that Flottec was a nonresident Bahamian corporation that did not conduct business in Texas. *Id.* The court found that Cappuccitti was not protected by the fiduciary shield doctrine with respect to his activities prior to the incorporation of Minerec. *Id.* at 485. It wrote,

19

> The record shows that Cappuccitti visited Texas on several occasions before Minerec and Flottec were incorporated on October 22, 2002, and Cappuccitti admits that he was acting in his capacity "as promoter of and on behalf of [the] company that became Minerec, Inc." In all of the cases cited by Cappuccitti, the individual over whom personal jurisdiction was sought was an *officer*, *employee*, or *shareholder* of an *existing* corporation. Cappuccitti cites no authority holding that the fiduciary shield doctrine also applies to a *promoter* of a *nonexistent* corporation. He argues, rather, that because a promoter is generally viewed as a trustee of his corporation and, therefore, owes a fiduciary duty to the corporation just as if the principal-agent relationship actually existed, a promoter should be extended the same protection under the fiduciary shield doctrine as the corporate officer who also owes a fiduciary duty to the corporation.

*Id.*

Clark attempts to distinguish this case by citing to the evidence in that case establishing alter ego since GIP presented sufficient evidence to "prove that a relationship among Cappuccitti, Minerec, and Flottec existed such that piercing the corporate veil and bringing Cappuccitti and Flottec within the personal jurisdiction of the trial court is justified." *Id.* at 482. Yet, the court determined that "[a] promoter cannot act as an agent of a corporation that does not yet exist; therefore, the corporation cannot be transacting business through the promoter, and the fiduciary shield doctrine cannot apply to him." *Id.* at 486. This finding was not dependent upon the alter ego status of the parties. The court found that "Cappuccitti's actions prior to the incorporation of Minerec and Flottec either occurred in Texas or were purposefully directed at Texas" and that he was subject to personal jurisdiction in Texas in his individual capacity. *Id.*

We conclude that the fiduciary shield doctrine does not apply because general jurisdiction is not at issue here. Instead, we focus on whether the pleadings and evidence establish that Clark engaged in tortious or fraudulent acts in Texas for which he can be personally liable. Further, we

20

consider Clark's contacts prior to the formation of MLES as contacts conducted in Clark's individual capacity.

## VI.    The Trial Court Had Specific Jurisdiction Over Clark

### 1.  Minimum Contacts

MLC and Cagle point to "undisputed" evidence "by way of the testimony of Young and Cagle that Clark was present in Texas on several occasions prior to the consummation of the transaction made the basis of this lawsuit."  Clark's responses to requests for admissions stated he was present in 2007.  MLC and Cagle wrote "it is abundantly clear that Clark came to Texas on his own volition for the purpose of dealing with Cagle, thus doing business in the State of Texas."  Cagle testified that he dealt with Clark alone in deciding whether to sell the business and in negotiating the terms of the Asset Purchase Agreement.  There was testimony recalling several telephone calls placed from Clark to Cagle for the purpose of discussing the Asset Purchase Agreement.[12]  Cagle testified that during his negotiations for the sale of MLC, Clark represented that he had sources of additional funding to expand the business and that he would infuse sufficient capital into the business to fund expansion.

After the Asset Purchase Agreement was signed, Clark came to Texas on several occasions, albeit as MLES' corporate officer.  Cagle testified that during a meeting prior to the Arkansas and Louisiana bids, Clark stated, "I will have the funding that you need within the next

---

[12]The briefing and arguments at the special appearance discuss the Asset Purchase Agreement and the merger clause and suggest that any representations made prior to the formation of MLES are not actionable.  A special appearance relates solely to personal jurisdiction, not the merits of a claim or defense. *Tabacinic*, 372 S.W.3d at 666 (citing *Michiana*, 168 S.W.3d at 791–92).  Arguments related to the merger clause, which are better suited for a summary judgment battle, do not impact the jurisdictional analysis.

couple of weeks." Cagle represented that "the same promises and conditions" "made prior to the asset purchase agreement" "were generated in several of our board meetings in Carthage."[13]

"Specific jurisdiction is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts." *Spri Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010). Those who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject' to the jurisdiction of the latter in suits based on their activities." *Michiana*, 168 S.W.3d at 785 (quoting *Burger King*, 471 U.S. at 475). "So long as it creates a substantial connection with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 n.18 (1985). MLC and Cagle bore the initial burden of proof to plead sufficient allegations to bring Clark within the provisions of the Texas long-arm statute. *Abbott*, 316 S.W.3d at 229.

The trial court found that the petition raised claims of breach of contract, fraud, and negligent misrepresentation. The petition stated that Clark "induced Cagle to give up a going business . . . and . . . failed to deliver upon promises and representations made to Cagle in contemplation of going into business." The evidence established that prior to the formation of MLES, the alleged misrepresentations and fraudulent acts were made in Texas by Clark in his individual capacity. Thus, MLC and Cagle's claims arise out of Clark's individual contacts with Texas. These contacts with Texas were not merely fortuitous, they were purposefully made by

---

[13]Cagle testified that Clark stated he had done a detailed analysis of the company and that he had access to additional funding from several sources. Cagle further stated that before MLES was formed, Clark represented that he had unlimited access to capital to allow growth of the company.

22

Clark who, according to Cagle's testimony, sought to benefit financially from this business venture. Moreover, "[c]orporate officers are not shielded from the exercise of specific jurisdiction for fraudulent or [tortious] acts for which they may be liable." *Barnhill*, 222 S.W.3d at 768. Whether representations made by Clark in his individual capacity were fraudulent or tortious will be a matter left to litigation after complete discovery. We find that MLC and Cagle met their initial burden to demonstrate Clark's minimum contacts with the State of Texas.

Thus, the burden of proof shifted to Clark, who was required to negate all possible grounds for personal jurisdiction alleged. Clark's evidence does not challenge the alleged misrepresentations, breach of contract, fraud, or fraudulent inducement claims from which MLC and Cagle's claims arise. Rather, he attempts to apply the fiduciary shield doctrine, which we have rejected, to avoid jurisdiction and attempts to deny liability in his individual capacity, an issue that is better reserved for summary judgment.

We find that Clark's contacts were sufficient to meet the minimum contacts analysis.

*2. Fair Play and Substantial Justice*

Next, we consider whether the exercise of personal jurisdiction over Clark comports with traditional notions of fair play and substantial justice.[14] Factors relevant to this inquiry include (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental, substantive social policies. *Guardian*

---

[14]Clark's brief does not discuss this analysis.

*Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).

We also find that the exercise of personal jurisdiction over Clark will not offend traditional notions of fair play and substantial justice. The trial court's findings of fact recited that Clark would "incur substantial expenses for travel, lodging and meals while away from his home in New York." According to Cagle, Clark owned "Premier Pipeline Company in Fort Worth," "two salt water companies; one in Houston, one in Odessa," "a rig-moving company in Midland," and another company which Cagle could not recall (albeit in some indirect capacity). Cagle also stated that he met Clark several times to conduct business in a Fort Worth office. We note that "distance from the forum is generally not sufficient to defeat jurisdiction because the availability of 'modern transportation and communication have made it less burdensome for a party sued to defend himself in a state where he engages in economic activity.'" *Barnhill*, 222 S.W.3d at 770 (quoting *Paul Gillrie Inst., Inc. v. Universal Computer Consulting, Ltd.*, 183 S.W.3d 755, 764 (Tex. App.—Houston [1st Dist.] 2005, no pet.)). "Litigation away from home creates hardship for a defendant," but "there is no legal requirement that this hardship must be borne instead by the plaintiff whenever the defendant is not found in the state of the plaintiff's residence." *Id.* We find that the burden on Clark to litigate in Texas would not be considerable.

Second, "Texas has a substantial interest in protecting its citizens both against harm from breach of contract and against harm from the torts alleged in this litigation." *Cappuccitti*, 222 S.W.3d at 487. Accordingly, we find that Texas has an interest in adjudicating this dispute. Third, as a Texas corporation and resident, we find that MLC and Cagle can obtain the most convenient and efficient relief in Texas. Fourth, "Texas maintains an interest in 'adjudicating the

24

claims of Texas residents'" and litigation here will "provide both parties . . . the benefits and protections of our laws." *Barnhill*, 222 S.W.3d at 770 (quoting *Lewis v. Indian Springs Land Corp.*, 715 S.W.2d 906, 919 (Tex. App.—Dallas 2005, no pet.)). Because the alleged misrepresentations occurred during business meetings in Texas, potential witnesses would likely be located in Texas. Lastly, the shared interests of other several states in furthering fundamental, substantive social policies can be implemented in Texas as efficiently as they can in New York. *Id.*

We find that the trial court had specific jurisdiction over Clark. Thus, granting Clark's special appearance was erroneous. We sustain MLC and Cagle's point of error.

## VII. Conclusion

The trial court had specific jurisdiction over Clark. We reverse the trial court's grant of Clark's special appearance and remand the case to the trial court for further proceedings consistent with this opinion.

Jack Carter
Justice

Date Submitted:     March 27, 2013
Date Decided:       April 26, 2013

25