**Opinion issued February 23, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00191-CV

————————————

**CAERUS OIL AND GAS, LLC AND CAERUS OPERATING, LLC,**
**Appellants**

**V.**

**TERRA ENERGY PARTNERS, LLC AND TEP ROCKY MOUNTAIN,**
**LLC, Appellees**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-17993**

---

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellants, Caerus Oil and Gas, LLC and Caerus Operating, LLC (collectively, "Caerus"), challenge the trial court's order denying their second amended special appearance in favor of appellees, Terra Energy Partners, LLC and TEP Rocky Mountain, LLC (collectively, "Terra"), in Terra's suit against Caerus for breach of contract and breach of fiduciary duty. In its sole issue,[2] Caerus contends that the trial court erred in denying its second amended special appearance.

We reverse and render.

### Background

In its third amended petition, Terra alleges that it owns certain oil and gas wells in the Piceance Basin of Colorado. According to Terra, the wells that it owns are subject to Joint Operating Agreements (the "JOAs"). Caerus is the operator for the wells and "market[s] [the] natural gas production from the wells owned" by Terra.

Terra alleges that under a letter, dated August 19, 2010 and titled Gas Marketing Election Agreement, Noble Energy, Inc. ("Noble") expressly agreed to

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7).

[2]     Caerus lists four issues in the "Issues Presented" section of its appellant's brief, but all relate to the core issue in this appeal—whether the trial court erred in denying Caerus's second amended special appearance. For ease, we will refer to the core issue—whether the trial court erred in denying Caerus's second amended special appearance—as Caerus's "sole issue" on appeal, while still addressing the arguments raised in Caerus's briefing.

act as the "agent in marketing" the "share of natural gas production" of Williams Production RMT Company ("Williams"). Terra is a successor entity to Williams, and Caerus is a successor entity to Noble.

On December 1, 2012, Noble entered into a revised agreement with a natural gas importer, Williams Field Services, which "provide[d] for a fee per thousand cubic feet . . . for natural gas transported and contain[ed] minimum volume requirements" (the "Gathering Agreement"). The Gathering Agreement also stated that if Noble "fail[ed] to . . . transport[] a certain minimum volume of gas, it [was] to pay an additional amount as a penalty for the under-delivery of gas under the Gathering Agreement." According to Terra, when Caerus, as the successor entity to Noble, failed to deliver the minimum volume of gas required by the Gathering Agreement and paid the under-delivery penalty, Caerus charged Terra a portion of the under-delivery penalty and deducted that amount from the payment it tendered to Terra from the sale of Terra's gas. Terra alleges that Caerus improperly deducted about $550,000 from the amount it tendered to Terra from the sale of Terra's gas.

Terra also alleges that Caerus operates a road—the Garden Gulch Road—which is used for the operation of certain jointly owned wells in Colorado. A Road Construction and Maintenance Agreement governed the construction and operation of the Garden Gulch Road. An exhibit to the Road Construction and Maintenance Agreement provided the "[c]harges for the maintenance and operation of the road."

3

According to Terra, without authority, Caerus charged Terra a fixed fee of $15,000 per month "as a management fee to cover its . . . 'administrative and overhead costs' in [its] operati[on] and maint[enance] [of] the Garden Gulch Road."

Further, Terra alleges that the JOAs "contain[ed] a [Council of Petroleum Accountants Societies] Model Form Accounting Procedure . . . that provide[d] for what charges an [o]perator [could] [charge] to [a] non-operator[]" (the "Accounting Procedure"). The Accounting Procedure permitted an operator, like Caerus, to charge direct expenses in fifteen "separate categories and to charge a monthly fee for overhead" to a non-operator. The overhead fee was a fixed monthly fee and was meant to "compensate for administrative, supervision, office services[,] and warehousing costs" incurred by the operator. (Internal quotations omitted.) Yet, Terra asserts that Caerus improperly charged Terra, in addition to the amount allowed by the Accounting Procedure, $15,000 per month for the operation and maintenance of the Garden Gulch Road, which was not authorized by the Accounting Procedure. Although Terra notified Caerus of the overcharge, Caerus "refused to refund the [improper charges] and continue[d] to" overcharge Terra. In response, Caerus asserted its right to make such deductions under the JOAs and the Accounting Procedure.

Terra brings claims for breach of contract and breach of fiduciary duty against Caerus. As to its breach-of-contract claim, Terra alleges that Terra's wells are

4

operated pursuant to "a number of JOAs," which are contracts between Terra and Caerus. The JOAs contained the Accounting Procedure, which "specifie[d] what charge[s]" an operator, like Caerus, could "charge" a non-operator, like Terra. The JOAs also contained a Gas Balancing Agreement "that provide[d] for the marketing of natural gas production from the wells." The JOAs did not allow Caerus to impose "an overhead charge for operating" the Garden Gulch Road, and the Road Construction and Maintenance Agreement did not allow for an overhead charge. Instead, the Accounting Procedure and the Road Construction and Maintenance Agreement governed "what c[ould] be charged to Terra" by Caerus for the operation and maintenance of the Garden Gulch Road. The Accounting Procedure provided for a fixed monthly overhead fee, but it "d[id] not permit an[y] additional overhead or administrative fee" such as the one that Caerus had been charging for the operation and maintenance of the Garden Gulch Road. Further, neither the Gathering Agreement nor any other agreement between Terra and Caerus allowed Caerus to charge Terra an under-delivery penalty because Caerus had not met the "minimum volume obligation to the natural gas gatherer" required under the Gathering Agreement.

As to its breach-of-fiduciary-duty claim, Terra alleges that Caerus agreed to act as Terra's agent for the marketing of the natural gas that Terra produced. The Gathering Agreement required Caerus (previously Noble) to deliver a specific

5

minimum volume of natural gas per year or to pay an under-delivery penalty. But neither the Gathering Agreement nor any other agreement between Terra and Caerus allowed Caerus to deduct an under-delivery penalty from the amount Caerus tendered to Terra from the sale of Terra's gas. Terra was not a party to the Gathering Agreement. The deduction by Caerus of the under-delivery penalty constituted a breach of its fiduciary duty to Terra. And Caerus wrongfully benefitted from its improper deductions. Terra seeks actual damages, attorney's fees, and costs.

As to personal jurisdiction, Terra alleges that Texas has personal jurisdiction over Caerus because "an agreement between [Caerus] and Terra obligated Caerus to remit the proceeds of [the] sale of Terra's natural gas to Terra in Texas." Further, Terra alleges that Caerus committed a tort, which was the subject of Terra's suit, in whole or in part in Texas because Caerus "breached [its] fiduciary dut[y] to Terra by making improper deductions from the proceeds of the sale [of Terra's gas] which [Caerus sent] to Terra in Texas." And Caerus breached its contract with Terra by "submitt[ing] invoices to Terra, in Texas, for charges that exceeded the amount permitted by the contracts" between Terra and Caerus. The Gas Marketing and Election Agreement permitted Caerus "to make a deduction for post-production expenses charged or deducted by the entities purchasing or transporting the gas and a marketing fee." And the Gas Marketing and Election Agreement contained a Texas choice-of-law provision. Caerus tendered payments to Terra, but with

6

unauthorized deductions, which breached the fiduciary duty owed to Terra by Caerus. According to Terra, the assumption of personal jurisdiction over Caerus would not offend traditional notions of fair play and substantial justice and the exercise of jurisdiction was "consistent with federal and state due-process guarantees."

Caerus filed a second amended special appearance, asserting that Terra had failed to plead, in its third amended petition, jurisdictional facts that showed any connection between Caerus and Texas that could satisfy specific or general jurisdiction. Caerus asserted that it was a Delaware limited liability company, with its principal place of business in Colorado. Caerus was not a resident of Texas, did not maintain an office or other place of business in Texas, was not registered to do business in Texas, did not have a registered agent in Texas, did not have any operations in Texas, did not pay taxes in Texas, and had never owned or leased land, offices, or facilities in Texas. Caerus did not maintain bank accounts in Texas and did not have employees in Texas.

Caerus explained that Terra had alleged breach-of-contract and breach-of-fiduciary-duty claims against Caerus for "purported[ly] improper charges and deductions" that Caerus had made from the proceeds of the sale of Terra's gas. The purportedly improper charges and deductions related to two assets located in Colorado: (1) "a set of 69 oil and gas wells in the Piceance Basin of Colorado in

7

which Terra ha[d] a working interest" and (2) "a road called the Garden Gulch Road, also located in Colorado." As to Terra's "oil and gas wells," which were located and operated in Colorado, Caerus noted that they were governed by the JOAs which, in turn, were governed by Colorado law. The JOAs were originally between Williams and Noble, but in 2014, Caerus acquired Noble's share of the sixty-nine oil and gas wells and inherited the JOAs and other contracts related to the wells. Caerus, which operates exclusively in Colorado, also took over as operator of the sixty-nine oil and gas wells.

In 2016, Terra entered into a transaction whereby it became the successor by merger to Williams, and it took over Williams's assets and contracts related to the sixty-nine wells in the Piceance Basin of Colorado. Williams's ownership of the wells predated Caerus's ownership of the wells. Caerus did not "solicit Terra as a working interest owner" and did not have "any say in whether [Williams] elected to merge with Terra, a Texas company." Terra, through its merger with Williams, acquired substantial assets in Colorado.

As to the Garden Gulch Road, which is located and operated in Colorado, Caerus explained that the road's operation and maintenance was governed by a Road Construction and Maintenance Agreement, not by the JOAs. Various parties, including Williams, originally entered into the Road Construction and Maintenance Agreement on November 1, 2005. The Road Construction and Maintenance

8

Agreement "set[] forth the rights and obligations of the participants and operators with regard to the construction and maintenance of the Garden Gulch Road." The Road Construction and Maintenance Agreement was governed by Colorado law, and each party to the Road Construction and Maintenance Agreement expressly consented to personal jurisdiction in Colorado for any suit filed arising under the Road Construction and Maintenance Agreement.

In 2013, Caerus acquired the Garden Gulch Road and the entity that operated the Garden Gulch Road. Terra acquired its rights to the Garden Gulch Road in its 2016 merger with Williams. Caerus did not "solicit[] Terra's involvement in the Garden Gulch Road," and Caerus "never took any action to encourage Terra's involvement" in the road. Terra made a unilateral choice to transact with Williams which resulted in Terra's involvement in the Garden Gulch Road.

Caerus further explained, as to Terra's breach-of-contract and breach-of-fiduciary duty claims, that Terra had alleged that Caerus had agreed to act as Terra's agent for the marketing of its natural gas production and because Caerus made deductions and charges that Terra asserted should not have been charged under the JOAs, the Road Construction Agreement, and the Gathering Agreement, Caerus breached a contract and breached a fiduciary duty to Terra.

According to Caerus, Terra had not met its burden of pleading allegations in its third amended petition that brought Caerus within the Texas long-arm statute

9

because Terra only alleged that it, and not Caerus, was a resident of Texas, certain agreements obligated Caerus to remit proceeds from the sale of Terra's gas to Terra in Texas, Caerus made payments with improper deductions and sent invoices with improper charges to Terra in Texas, and the predecessor entities to Terra and Caerus were parties to a Gas Marketing Election Agreement that had a Texas choice-of-law provision, but did not have a venue provision or a forum-selection clause for Texas. Terra's allegation that Caerus remitted payment and invoices to Terra in Texas did not support the exercise of personal jurisdiction because a contract was not performed in whole or in part in Texas and a tort had not been committed in Texas. The actual contracts at issue in Terra's suit—the JOAs and the Road Construction and Maintenance Agreement, which Terra had alleged did not allow Caerus to make certain charges to Terra—were not performed in Texas, but instead in Colorado. And any activity supporting Terra's breach-of-fiduciary-duty claim could not have occurred in Texas because Caerus conducted its business in Colorado and did not have any officers or employees in Texas. Because Terra failed to plead allegations to bring Caerus within reach of the Texas long-arm statute, Caerus asserted that it needed only to prove that it did not reside in Texas to negate jurisdiction, and it was undisputed that Caerus did not reside in Texas.

Caerus further asserted that, even if Terra had satisfied its pleading burden, no specific jurisdiction existed over Caerus in Texas because Caerus lacked

10

sufficient minimum contacts with Texas to satisfy due process requirements. A nonresident defendant has sufficient minimum contacts with Texas only if (1) the nonresident defendant purposefully availed itself of the privilege of conducting activities in the forum state and (2) there is a substantial connection between the contacts and the operative facts of the litigation.

According to Caerus, merely contracting with a Texas resident and initiating contract discussions with a Texas resident was not sufficient for jurisdiction. Further, making a payment in Texas was insufficient when the entire substance of the contract was performed outside of the state, and when a "contract require[d] the payment of money but d[id] not specify where payment [was] to be made, the place of payment [was] the domicile of the payor . . . regardless of where the payment [was] finally received." (Fifth alteration in original.) (Internal quotations omitted.) Although Terra alleged, as to its breach-of-contract and breach-of-fiduciary-duty claims, that Caerus had contracted with a Texas resident and had committed a tort in Texas, Terra solely relied on Caerus making payments and sending invoices to Texas. But the JOAs and the Road Construction and Maintenance Agreement were wholly to be performed in Colorado, where the assets and operations were located. And both contracts were expressly governed by Colorado law; the JOAs and Road Construction and Maintenance Agreement did not state that payments should be directed to Texas. Additionally, as to the breach-of-fiduciary-duty claim, in which

11

Terra alleged that Caerus made improper charges and deductions under the terms of the JOAs and the Road Construction and Maintenance Agreement, the relevant assets for Terra's claim were located in Colorado, the assets were operated and maintained in Colorado, Caerus's offices and billing processes were in Colorado, and Caerus did not have any employees in Texas. To the extent that any of Caerus's conduct constituted breaches of its fiduciary duty, that conduct could only have occurred in Colorado. Further, Caerus noted that, although Terra and Caerus were both successor entities to the parties who entered into the JOAs and the Road Construction and Maintenance Agreement, Caerus took over as the operator of the oil and gas wells and acquired the Garden Gulch Road in 2013 and 2014. Only after Caerus became a successor entity did Terra, through a unilateral act, merge with Williams. That unilateral act by Terra was the reason for the contractual relationship between Terra and Caerus about which Terra complained. According to Caerus, Terra could not satisfy the purposeful availment requirement when any contacts Caerus had with Texas were the result of Terra's unilateral activity.

Caerus also asserted that Texas law was clear that there was no specific jurisdiction over a nonresident defendant unless a cause of action arises from or is related to an activity conducted within the forum and the focus is on the relationship among the nonresident defendant, the forum, and the litigation. "The 'arises from or is related to' requirement of specific jurisdiction requires a 'substantial

12

connection' between the [nonresident] defendant's contacts and the 'operative facts of the litigation.'" (Emphasis omitted.) And contracts with third parties that are unrelated to the litigation will not provide specific jurisdiction.

Here, Terra alleged that Caerus personally "traveled to Texas over the last five years to market [its] 'activities in other states'" during a "networking expo for energy professionals." And that "Caerus . . . promoted its activities to Texas companies virtually and its personnel traveled to Texas to promote Caerus exploration activities[,] [similar to] the one Terra [was] involved in, to Texas companies." (Internal quotations omitted.) But those contacts did not satisfy the purposeful availment requirement because they related to the sale of assets owned by a subsidiary of Caerus, and not Caerus itself. And Terra failed to tie Caerus's few alleged Texas contacts to the claims alleged in Terra's suit.

To the extent that Terra relied on the Gas Marketing Election Agreement, which contained "a Texas choice[-]of[-]law clause," to support the exercise of specific jurisdiction over Caerus, Caerus asserted that the Gas Marketing Election Agreement did not actually govern Terra's breach-of-contract and breach-of-fiduciary-duty claims. The Gas Marketing Election Agreement, by its own terms, concerned solely the issue of whether Williams (now Terra) elected to take gas in-kind or elected for Noble (now Caerus) to market the gas for Williams (now Terra). The question of what Terra's appropriate share of the gas was—the

disputed issue in Terra's suit—was controlled by the JOAs, which were governed by Colorado law. Further, even if the Gas and Marketing Election Agreement was applicable, it did not contain a forum-selection clause or a venue provision, and there was no suggestion in the Gas and Marketing Election Agreement that the parties to the agreement agreed to subject themselves to personal jurisdiction in Texas. A choice-of-law provision, such as the one found in the Gas Marketing Election Agreement, could not give rise to personal jurisdiction in Texas.

Caerus further argued that the exercise of jurisdiction over it in Texas would offend traditional notions of fair play and substantial justice because Caerus had extremely limited contacts with Texas over the last decade and none of those contacts related to the issues in Terra's suit. The contracts at issue in Terra's suit were not connected to Texas.

Additionally, Caerus asserted that the burden on Caerus to litigate in Texas would be significant. The assets at issue in Terra's suit were located in Colorado, and the operation and maintenance of those assets took place in Colorado. The witnesses and any of Caerus's relevant documents were located in Colorado; Caerus did not have any employees or operations in Texas. And Terra regularly did business in Colorado, had an office and employees there, and held itself to be "the largest operator in the Piceance Basin" of Colorado. (Internal quotations omitted.) Terra's oil and gas assets appeared to be solely located in Colorado, and it would not be

14

burdensome on Terra to litigate in Colorado. Colorado, and not Texas, had a strong interest in adjudicating the dispute, and Colorado law governed the JOAs and the Road Construction and Maintenance Agreement.

Caerus attached to its second amended special appearance the affidavit of Aubree Besant, the Managing Director of Land and Minerals for Caerus. In her affidavit, Besant testified that she had been employed by Caerus since 2010. Caerus was a Delaware limited liability company, with its principal place of business in Colorado. Caerus was a nonresident of Texas, did not maintain an office or other place of business in Texas, was not registered to do business in Texas, did not have a registered agent in Texas, did not have any operations in Texas, did not pay taxes in Texas, did not and had never owned or leased any land, offices, or facilities in Texas, did not maintain bank accounts in Texas, and did not have any employees in Texas.

According to Besant, in 2013, Caerus entered into a transaction to acquire certain assets from PDC Energy, Inc. ("PDC"), including the Garden Gulch Road, which is located in Colorado, and Garden Gulch LLC, a wholly owned subsidiary of PDC and the operator of the Garden Gulch Road. As a result of the transaction, Garden Gulch LLC became a Caerus entity and operated the Garden Gulch Road pursuant to the terms of the Road Construction and Maintenance Agreement—an agreement that Caerus inherited from PDC. Williams was also a party to the Road

15

Construction and Maintenance Agreement before, and when, Caerus entered into the transaction with PDC in 2013.

In 2014, Caerus entered into a transaction to acquire certain oil and gas wells owned and operated by Noble that were located in the Piceance Basin of Colorado. As a result of the transaction, Caerus inherited the JOAs and other agreements that were already in place for the Colorado oil and gas wells, and Caerus took over as operator for the wells. Williams also owned an interest in the Piceance Basin oil and gas wells, before and at the time that, Caerus entered into the 2014 transaction with Noble.

Caerus operates over 3,000 wells in the Piceance Basin, but only sixty-nine wells were related to Terra's suit. Caerus did not market, advertise, or sell any interest in any of the oil and gas wells related to the suit. Caerus also never marketed or sold any interest in the Garden Gulch Road after acquiring the road in 2013. Caerus did not market, advertise, or engage in sale activities in Texas related to the assets at issue in Terra's suit—the sixty-nine jointly owned oil and gas wells and the Garden Gulch Road.

Caerus also attached to its second amended special appearance a copy of a printout from Terra's website, stating as to Terra's assets:

> Terra . . . is the largest operator in the Piceance Basin. With roughly 370,000 net acres and 5,300 operated wells across the basin, Terra produces an average of 500 million cubic feet of gas per day. The Piceance Basin is an important source of natural gas for the State of

16

Colorado, and the United States. . . . Terra is committed to operating effectively and efficiently in Colorado . . . .

The printout also noted that Terra had a field office in Colorado.

Further, Caerus attached a copy of a JOA, dated May 25, 2005, between Noble, as operator, and Williams, as non-operator, stating that it was governed by Colorado law. Specifically, the JOA stated:

> This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation and construction, shall be governed and determined by the law of the state to which the Contract Area is located [in Colorado]. If the Contract Area is in two or more states, the law of the state of Colorado shall govern.

Attached as an exhibit to the JOA was an "Accounting Procedure," stating that the operator "shall bill [n]on-[o]perators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month." "Such bills w[ould] be accompanied by statements which identif[ied] the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense . . . ." The "Joint Account" was "the account showing the charges paid and credits received in the conduct of the Joint Operations and which [were] to be shared by the [p]arties." (Internal quotations omitted.) Also attached as an exhibit to the JOA was the Gas Balancing Agreement, dated May 25, 2005, between Noble, as operator, and Williams, as non-operator.

Additionally, Caerus attached to its second amended special appearance a copy of the Road Construction and Maintenance Agreement, dated November 1, 2005, between various participants, including PDC and Williams. Garden Gulch, LLC was listed as the operator under the agreement. The Road Construction and Maintenance Agreement stated that it set forth the rights and obligations of the operator and the participants with regard to the construction and maintenance of the Garden Gulch Road, which was located in Garfield County, Colorado. The Garden Gulch Road provided the agreement's participants with "access to and egress from certain wells, gas pipelines and gathering systems, water pipelines, tanks, compressors and other similar oil and gas exploration, production, gathering and transportation equipment and facilities on the lands located in [certain portions of] Colorado." The operator was responsible for the operation and maintenance of the Garden Gulch Road, and the agreement's participants were responsible for "the costs and expenses necessary to construct, operate, and maintain the [r]oad." The Road Construction and Maintenance Agreement stated that it was governed by Colorado law and each participant in the agreement "expressly consent[ed] to personal jurisdiction of the state and federal courts located in Denver, Colorado, for any lawsuit filed against it arising under the [a]greement." The Road Construction and Maintenance Agreement was binding on the participants to the agreement and "their respective successors and assigns."

18

In its response to Caerus's second amended special appearance, Terra asserted that Caerus was subject to specific jurisdiction in Texas.[3] Caerus's sale of Terra's natural gas production was governed by the Gas Marketing Election Agreement, and "Texas ha[d] jurisdiction over Caerus[']s actions under the Gas Marketing [Election] Agreement." According to Terra, the Gas Marketing and Election Agreement "provide[d] that Caerus [was] Terra's agent" and "provide[d] for what c[ould] be deducted from Terra's share of revenue." And Terra had alleged that Caerus made improper deductions from the amount it tendered to Terra from the sale of Terra's gas. According to Terra, the Gas Marketing and Election Agreement "provide[d] for Texas law to apply" to disputes under the agreement, and the Gas Marketing and Election Agreement "supersede[d] the JOAs and the Gas Balancing Agreement." As to Terra's complaints about the Garden Gulch Road, it stated that its claim "deal[t] strictly with the charges Caerus levie[d] for its handling of the road." And according to Terra, "jurisdiction exist[ed] in Texas over the charges made by Caerus for 'overhead' in its operation of the road."

Terra attached to its response a letter, dated August 19, 2010 and titled "Gas Marketing Election Agreement." The Gas Marketing Election Agreement was between Williams and Noble and concerned whether Williams elected to take gas in-kind and market the gas itself or whether Williams elected for Noble to market its

---

[3] Terra did not assert that Caerus was subject to general jurisdiction in Texas.

gas on its behalf. The agreement stated: "If you elect to participate in the drilling and completion of the above referenced well(s) pursuant to the governing [JOA], you must elect either to take your share of natural gas in-kind or market your share of natural gas . . . with Noble." The Gas Marketing Election Agreement provided that the "drilling and completion" of wells was "govern[ed]" by the JOAs and Terra's "share of gas production w[ould] . . . be accounted for in accordance with the terms of the governing Gas Balancing Agreement," an exhibit to the JOAs. The Gas Marketing Election Agreement stated that it was "governed by the laws of . . . Texas."

The trial court denied Caerus's second amended special appearance.

## Standard of Review

The existence of personal jurisdiction is a question of law, which must sometimes be preceded by the resolution of underlying factual disputes. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Paul Gillrie Inst., Inc. v. Universal Comput. Consulting, Ltd.*, 183 S.W.3d 755, 759 (Tex. App.—Houston [1st Dist.] 2005, no pet.). When the underlying facts are undisputed or otherwise established, we review a trial court's denial of a special appearance de novo. *Paul Gillrie Inst.*, 183 S.W.3d at 759. Where, as here, a trial court does not issue findings of fact or conclusions of law with its special-appearance ruling, all fact findings necessary to support the judgment and that are supported by the

20

evidence are implied. *Marchand*, 83 S.W.3d at 795; *Paul Gillrie Inst.*, 183 S.W.3d at 759.

A trial court determines a "special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3). A single basis for personal jurisdiction is sufficient to confer jurisdiction over a nonresident defendant. *See Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Thus, if a nonresident defendant is subject to specific jurisdiction, this is sufficient. *See Am. Express Centurion Bank v. Haryanto*, 491 S.W.3d 337, 346 n.8 (Tex. App.—Beaumont 2016, no pet.); *Minnis*, 305 S.W.3d at 279; *see also* TEX. R. APP. P. 47.1.

The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Am. Type Culture Collection v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002); *Paul Gillrie Inst.*, 183 S.W.3d at 759. The burden of proof then shifts to the nonresident defendant to negate all the bases of jurisdiction alleged by the plaintiff. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985); *see also Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010) ("Because the plaintiff

defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading.").

The nonresident defendant can negate jurisdiction on either a factual or a legal basis. *Kelly*, 301 S.W.3d at 659. Factually, the nonresident defendant can present evidence that it had no contacts with Texas, "effectively disproving the plaintiff's allegations." *Id.* The plaintiff can then respond with its own evidence affirming its allegations, and if it does not present evidence establishing personal jurisdiction, it risks dismissal of its suit. *Id.* Legally, the nonresident defendant can show that, even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the nonresident defendant's contacts with Texas do not constitute purposeful availment for specific jurisdiction; the claims do not arise from the contacts with Texas; or the exercise of jurisdiction offends traditional notions of fair play and substantial justice. *Id.*

A court need not assess the nonresident defendant's contacts on a claim-by-claim basis where, as here, all claims essentially arise from the same forum contacts. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150–51 (Tex. 2013); *Proppant Sols., LLC v. Delgado*, 471 S.W.3d 529, 537 (Tex. App.—Houston [1st Dist.] 2015, no pet.). If a case involves more than one nonresident defendant, the plaintiff must specify, and the court must examine, "each [nonresident] defendant's actions and contacts with the forum"; the defendants'

contacts cannot be aggregated. *See Morris v. Kohls-York*, 164 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. dism'd); *see also Loya v. Taylor*, No. 01-14-01014-CV, 2016 WL 6962312, at *3 (Tex. App.—Houston [1st Dist.] Nov. 29, 2016, pet. denied) (mem. op.).

**Personal Jurisdiction**

In its sole issue, Caerus argues that the trial court erred in denying its second amended special appearance and concluding that Texas has personal jurisdiction over it because Terra failed to allege sufficient jurisdictional facts against Caerus, there is no specific jurisdiction over Caerus in Texas, and exercising personal jurisdiction would offend principles of fair play and substantial justice.

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Fourteenth Amendment's due process clause and the Texas long-arm statute are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226–27 (Tex. 1991). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. The nonresident defendant "does business" in Texas if it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part" in Texas, it "commits a tort in whole or in part" in Texas, or it

23

"recruits Texas residents, directly or through an intermediary located in [Texas], for employment inside or outside the state." *Id.* The Texas Supreme Court has consistently interpreted this statutory language "to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal*, 815 S.W.2d at 226. Therefore, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *Id.*

The United States Constitution permits a state to assert personal jurisdiction over a nonresident defendant only if it has some minimum, purposeful contacts with the state and if the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson-Austin v. Austin*, 968 S.W.2d 319, 326 (Tex. 1998). A nonresident defendant that has purposefully availed itself of the privileges and benefits of conducting business in the state has sufficient contacts with the state to confer personal jurisdiction. *See Guardian Royal*, 815 S.W.2d at 226.

The "purposeful availment" requirement has been characterized by the Texas Supreme Court as the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). In *Michiana*, the supreme court articulated three important aspects of the purposeful availment inquiry. *Id.* at 785. First, only the nonresident defendant's contacts with the forum count. *Id.* This ensures that the nonresident defendant is not haled into a jurisdiction

24

solely by the unilateral activities of a third party. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Second, the acts relied on must be purposeful; the nonresident defendant may not be haled into a jurisdiction solely based on contacts that are "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)). Third, the nonresident defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" because "[j]urisdiction is premised on notions of implied consent" and by "invoking the benefits and protections of a forum's laws, . . . [the] nonresident consents to suit there." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The nonresident defendant's contacts with a forum can give rise to either general or specific jurisdiction. *Marchand*, 83 S.W.3d at 795. Specific jurisdiction is established if the nonresident defendant's alleged liability arises from or relates to an activity conducted within the forum. *Id.* at 796. When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the nonresident defendant, the forum, and the litigation. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007).

Foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state. *Burger King Corp.*, 471 U.S. at 474; *Guardian Royal*, 815 S.W.2d at

25

227. The concept of foreseeability is implicit in the requirement that there be a substantial connection between the nonresident defendant and Texas, arising from actions or conduct of the nonresident defendant purposefully directed toward Texas. *Guardian Royal*, 815 S.W.2d at 227.

In a portion of its sole issue, Caerus argues that the trial court erred in concluding that Texas has specific jurisdiction over it because Caerus "[d]id [n]ot [p]urposely [a]vail [itself] of the Texas [f]orum" and the "[p]urported Texas [c]ontacts [i]dentified by Terra [were] [n]ot [sufficient to establish specific jurisdiction where] Caerus['s] [a]lleged [l]iability d[id] [n]ot '[a]rise [f]rom or [r]elate to' [t]he[] [a]ctivities."

For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the nonresident defendant's contacts with Texas must be purposeful and (2) the cause of action must arise from or relate to those contacts. *Coleman*, 83 S.W.3d at 806; *see also Moki Mac*, 221 S.W.3d at 576, 579.

In its third amended petition, Terra alleges that it owns certain oil and gas wells in the Piceance Basin of Colorado. According to Terra, the wells it owns are subject to JOAs. Caerus is the operator for the wells and markets Terra's natural gas production.

Terra alleges that in a letter, dated August 19, 2010 and titled Gas Marketing Election Agreement, Noble—Caerus's predecessor entity—agreed to act as the

"agent in marketing" the "share of natural gas production" of Williams—Terra's predecessor entity.

On December 1, 2012, Noble entered into a Gathering Agreement with Williams, which "provide[d] for a fee per thousand cubic feet . . . for natural gas transported and contain[ed] minimum volume requirements." The Gathering Agreement also stated that if Noble "fail[ed] to . . . transport[] a certain minimum volume of gas, it [was] to pay an additional amount as a penalty for the under-delivery of gas under the Gathering Agreement." According to Terra, when Caerus, as the successor entity to Noble, failed to deliver the minimum volume of gas required by the Gathering Agreement and paid the under-delivery penalty, Caerus charged Terra a portion of the under-delivery penalty and deducted that amount from the payment it tendered to Terra from the sale of Terra's gas. Terra alleges that Caerus improperly deducted about $550,000 from the amount it tendered to Terra for the sale of Terra's gas.

Terra also alleges that Caerus operates a road—the Garden Gulch Road—which is used for the operation of Terra's jointly owned wells. A Road Construction and Maintenance Agreement governed the construction and operation of the Garden Gulch Road. An exhibit to the Road Construction and Maintenance Agreement provided the "[c]harges for the maintenance and operation of the road." According to Terra, without authority, Caerus improperly charged Terra a fixed fee of $15,000

27

per month "as a management fee to cover its . . . 'administrative and overhead costs' in [its] operati[on] and maint[enance] [of] the Garden Gulch Road."

Further, Terra alleges that the relevant JOAs contain an Accounting Procedure which "provide[d] [the] charges an [o]perator," like Caerus, could charge to a non-operator, like Terra. The Accounting Procedure permitted an operator to charge direct expenses in fifteen "separate categories and to charge a monthly fee for overhead" to a non-operator. The overhead fee was a fixed monthly fee and was meant to "compensate for administrative, supervision, office services[,] and warehousing costs" incurred by the operator. (Internal quotations omitted.) But Caerus improperly charged Terra, in addition to the amount provided for in the Accounting Procedure, $15,000 per month related to the Garden Gulch Road. Although Terra notified Caerus of the overcharge, Caerus "refused to refund the [improper charges] and continue[d] to" overcharge Terra. In response, Caerus asserted its right to make such deductions under the JOAs and the Accounting Procedure.

Terra brings claims for breach of contract and breach of fiduciary duty against Caerus. As to its breach-of-contract claim, Terra alleges that Terra's wells are operated pursuant to "a number of JOAs," which were contracts between Terra and Caerus. The JOAs contained the Accounting Procedure, which "specifie[d] what charge[s]" an operator, like Caerus could "charge" a non-operator, like Terra. The

28

JOAs also contained a Gas Balancing Agreement "that provide[d] for the marketing of natural gas production from the wells." The JOAs did not "permit an overhead charge for" Caerus's operation of the Garden Gulch Road, and the Road Construction and Maintenance Agreement did not allow for such an overhead charge. Instead, the Accounting Procedure and the Road Construction and Maintenance Agreement governed "what c[ould] be charged to Terra" by Caerus for the operation and maintenance of the Garden Gulch Road. The Accounting Procedure provided for a fixed monthly overhead fee, but "d[id] not permit an[y] additional overhead or administrative fee" such as the one that Caerus had been charging for the operation and maintenance of the Garden Gulch Road. Further, neither the Gathering Agreement nor any other agreement between Terra and Caerus allowed Caerus to charge Terra an under-delivery penalty because Caerus had not met the "minimum volume obligation to the natural gas gatherer" as required by the Gathering Agreement.

As to its breach-of-fiduciary-duty claim, Terra alleges that Caerus agreed to act as Terra's agent for the marketing of its natural gas production. The Gathering Agreement required Caerus (previously Noble) to deliver a specific minimum volume of natural gas per year or to pay an under-delivery penalty. But neither the Gathering Agreement nor any other agreement between Terra and Caerus allowed Caerus to deduct an under-delivery penalty from the amount tendered to Terra from

29

the sale of Terra's gas, and Terra was not a party to the Gathering Agreement. The deduction of the under-delivery penalty constituted a breach of Caerus's fiduciary duty to Terra. And Caerus wrongfully benefitted from its improper deductions.

As to personal jurisdiction, in its third amended petition, Terra alleges that Texas has personal jurisdiction over Caerus because "an agreement between [Caerus] and Terra obligated Caerus to remit the proceeds of [the] sale of Terra's natural gas to Terra in Texas." Further, Caerus committed a tort, which was the subject of Terra's suit, in whole or in part in Texas because Caerus "breached [its] fiduciary dut[y] to Terra by making improper deductions from the proceeds of the sale [of Terra's gas] which [Caerus sent] to Terra in Texas." And Caerus breached its contract with Terra by "submitt[ing] invoices to Terra, in Texas, for charges that exceeded the amount permitted by the contracts" between Terra and Caerus. The Gas Marketing and Election Agreement permitted Caerus "to make a deduction for post-production expenses charged or deducted by the entities purchasing or transporting the gas and a marketing fee." And the Gas Marketing and Election Agreement contained a Texas choice-of-law provision. Caerus tendered payments to Terra, but with unauthorized deductions, which breached the fiduciary duty owed to Terra by Caerus.

In its response to Caerus's second amended special appearance, Terra asserted that Caerus was subject to specific jurisdiction in Texas because Caerus's sale of

30

Terra's natural gas production was governed by the Gas Marketing Election Agreement, and "Texas ha[d] jurisdiction over Caerus['s] actions under the Gas Marketing [Election] Agreement." According to Terra, the Gas Marketing and Election Agreement "provide[d] that Caerus [was] Terra's agent" and "provide[d] for what c[ould] be deducted from Terra's share of revenue." And Terra had alleged that Caerus made improper deductions from the amount it tendered to Terra from the sale of Terra's gas. The Gas Marketing and Election Agreement "provide[d] for Texas law to apply" to disputes under the agreement, and the Gas Marketing and Election Agreement "supersede[d] the JOAs and the Gas Balancing Agreement." As to Terra's complaints about the Garden Gulch Road, it stated that its claim "deal[t] strictly with the charges Caerus levie[d] for its handling of the road." And Terra asserted, without detail, that "jurisdiction exist[ed] in Texas over the charges made by Caerus for 'overhead' in its operation of the road."

Terra attached to its response a letter, dated August 19, 2010 and titled "Gas Marketing Election Agreement." The Gas Marketing Election Agreement was between Williams and Noble and concerned whether Williams elected to take gas in-kind and market the gas itself or whether Williams elected for Noble to market its gas on its behalf. The Gas Marketing Election Agreement provided that the "drilling and completion" of wells was "govern[ed]" by the JOAs and Terra's "share of gas production w[ould] . . . be accounted for in accordance with the terms of the

31

governing Gas Balancing Agreement," an exhibit to the JOAs. The Gas Marketing Election Agreement stated that it was "governed by the laws of . . . Texas."

Caerus, in its second amended special appearance, explained that Terra had alleged breach-of-contract and breach-of-fiduciary-duty claims against Caerus for "purported[ly] improper charges and deductions" that Caerus had made from the amount tendered to Terra from the sale of Terra's gas. The purportedly improper charges and deductions related to two assets located in Colorado: (1) "a set of 69 oil and gas wells in the Piceance Basin of Colorado in which Terra ha[d] a working interest" and (2) "a road called the Garden Gulch Road, also located in Colorado." As to Terra's "oil and gas wells," which were located and operated in Colorado, Caerus explained that they were governed by the JOAs. The JOAs were governed by Colorado law. The JOAs were originally between Williams and Noble, but in 2014, Caerus acquired Noble's share of the sixty-nine oil and gas wells and inherited the JOAs and other contracts related to the wells. Caerus, which operated exclusively in Colorado, also took over as operator of the sixty-nine oil and gas wells.

In 2016, Terra entered into a transaction whereby it became the successor by merger to Williams, and it took over Williams's assets and contracts related to the sixty-nine wells in the Piceance Basin of Colorado. Williams's ownership of the wells predated Caerus's ownership of the wells. Caerus did not "solicit Terra as a

working interest owner" and did not have "any say in whether [Williams] elected to merge with Terra, a Texas company." But Terra, through its merger with Williams, chose to acquire substantial assets in Colorado.

As to the Garden Gulch Road, which is located and operated in Colorado, Caerus explained that the road's operation and maintenance was governed by a Road Construction and Maintenance Agreement, rather than the JOAs. Various parties, including Williams, originally entered into the Road Construction and Maintenance Agreement on November 1, 2005. The Road Construction and Maintenance Agreement "set[] forth the rights and obligations of the participants and operators with regard to the construction and maintenance of the Garden Gulch Road." The Road Construction and Maintenance Agreement was governed by Colorado law, and each party to the Road Construction and Maintenance Agreement expressly consented to personal jurisdiction in Colorado for any suit filed arising under the Road Construction and Maintenance Agreement.

In 2013, Caerus acquired the Garden Gulch Road and the entity that operated the Garden Gulch Road. Terra acquired its rights to the Garden Gulch Road in its 2016 merger with Williams. Caerus did not "solicit[] Terra's involvement in the Garden Gulch Road," and Caerus "never took any action to encourage Terra's involvement" in the road. Terra made a unilateral choice to transact with Williams, which resulted in Terra's involvement in the Garden Gulch Road.

33

According to Caerus, Terra's breach-of-contract and breach-of-fiduciary duty claims were based on its assertion that Caerus had agreed to act as Terra's agent for the marketing of natural gas production and because Caerus made deductions and charges that Terra asserted should not have been charged under the JOAs, the Road Construction Agreement, and the Gathering Agreement, Caerus breached a contract and breached a fiduciary duty to Terra.

As a basis for specific jurisdiction, Terra had alleged, related to its breach-of-contract and breach-of-fiduciary-duty claims, that Caerus had contracted with a Texas resident and had committed a tort in Texas; but in doing so, Terra solely relied on Caerus making payments and sending invoices to Texas. Notably, the JOAs and the Road Construction and Maintenance Agreement were to be wholly performed in Colorado, where the assets and operations were located. And both contracts were expressly governed by Colorado law; the JOAs and Road Construction and Maintenance Agreement did not state that payments should be directed to Texas. Additionally, as to the breach-of-fiduciary-duty claim, under which Terra had alleged that Caerus made improper charges and deductions under the terms of the JOAs and the Road Construction and Maintenance Agreement, the relevant assets for Terra's claim were located in Colorado, the assets were operated and maintained in Colorado, Caerus's offices and billing processes were in Colorado, and Caerus did not have any employees in Texas. If any of Caerus's

34

conduct constituted breaches of its fiduciary duty that conduct could only have occurred in Colorado.

Caerus also noted that, although Terra relied on the Gas Marketing Election Agreement, which contained "a Texas choice[-]of[-]law clause," to support the exercise of personal jurisdiction over Caerus, the Gas Marketing Election Agreement did not actually govern Terra's breach-of-contract and breach-of-fiduciary-duty claims. The Gas Marketing Election Agreement, by its own terms, concerned solely the issue of whether Williams (now Terra) elected to take gas in-kind or elected for Noble (now Caerus) to market the gas for Williams (now Terra). The question of what Terra's appropriate share of the gas was—the disputed issue in Terra's suit—was controlled by the JOAs, which were governed by Colorado law. Further, even if the Gas and Marketing Election Agreement was applicable, it did not contain a forum-selection clause or a venue provision, and there was no suggestion in the Gas and Marketing Election Agreement that the parties to the agreement agreed to subject themselves to personal jurisdiction in Texas. A choice-of-law provision, such as the one found in the Gas Marketing Election Agreement, could not give rise to personal jurisdiction in Texas.

Caerus attached to its second amended special appearance the affidavit of Besant, the Managing Director of Land and Minerals for Caerus. In her affidavit, Besant testified that she had been employed by Caerus since 2010. Caerus was a

Delaware limited liability company, with its principal place of business in Colorado. Caerus was a nonresident of Texas, did not maintain an office or other place of business in Texas, was not registered to do business in Texas, did not have a registered agent in Texas, did not have any operations in Texas, did not pay taxes in Texas, did not and had never owned or leased any land, offices, or facilities in Texas, did not maintain bank accounts in Texas, and did not have any employees in Texas.

According to Besant, in 2013, Caerus entered into a transaction to acquire certain assets from PDC, including the Garden Gulch Road, which was located in Colorado, and Garden Gulch LLC, a wholly owned subsidiary of PDC and the operator of the Garden Gulch Road. As a result of the transaction, Garden Gulch LLC became a Caerus entity and operated the Garden Gulch Road pursuant to the terms of the Road Construction and Maintenance Agreement—an agreement which Caerus inherited from PDC. Williams was also a party to the Road Construction and Maintenance Agreement before, and when, Caerus entered into the transaction with PDC in 2013.

In 2014, Caerus entered into a transaction to acquire certain oil and gas wells owned and operated by Noble that were located in the Piceance Basin of Colorado. As a result of the transaction, Caerus inherited the JOAs and other agreements that were already in place for the Colorado oil and gas wells, and Caerus took over as operator for the wells. Williams also owned an interest in the Piceance Basin oil and

36

gas wells, before and at the time that Caerus entered into the 2014 transaction with Noble.

Caerus operates over 3,000 wells in the Piceance Basin of Colorado, but only sixty-nine wells were related to Terra's suit. Caerus did not market, advertise, or sell any interest in any of the oil and gas wells related to the suit. Caerus also never marketed or sold any interest in the Garden Gulch Road after acquiring the road in 2013. Caerus did not market, advertise, or engage in sale activities in Texas related to the assets at issue in Terra's suit—the sixty-nine jointly owned oil and gas wells and the Garden Gulch Road.

Caerus also attached to its second amended special appearance a copy of a printout from Terra's website, stating as to Terra's assets:

> Terra . . . is the largest operator in the Piceance Basin. With roughly 370,000 net acres and 5,300 operated wells across the basin, Terra produces an average of 500 million cubic feet of gas per day. The Piceance Basin is an important source of natural gas for the State of Colorado, and the United States. . . . Terra is committed to operating effectively and efficiently in Colorado . . . .

The printout also noted that Terra had a field office in Colorado.

Further, Caerus attached a copy of a JOA, dated May 25, 2005, between Noble, as operator, and Williams, as non-operator, stating that it was governed by Colorado law. Specifically, the JOA stated:

> This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation and construction, shall be

governed and determined by the law of the state to which the Contract Area is located [in Colorado]. If the Contract Area is in two or more states, the law of the state of Colorado shall govern.

Attached as an exhibit to the JOA was an "Accounting Procedure," stating that the operator "shall bill [n]on-[o]perators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month." "Such bills w[ould] be accompanied by statements which identif[ied] the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense . . . ." The "Joint Account" was "the account showing the charges paid and credits received in the conduct of the Joint Operations and which [were] to be shared by the [p]arties." (Internal quotations omitted.) Also attached as an exhibit to the JOA was the Gas Balancing Agreement, dated May 25, 2005, between Noble, as operator, and Williams, as non-operator.

Additionally, Caerus attached to its second amended special appearance a copy of the Road Construction and Maintenance Agreement, dated November 1, 2005, between various participants including PDC and Williams. Garden Gulch, LLC was listed as the operator under the agreement. The Road Construction and Maintenance Agreement stated that it set forth the rights and obligations of the operator and the participants with regard to the construction and maintenance of the Garden Gulch Road, which was located in Garfield County, Colorado. The Garden Gulch Road provided the participants to the agreement with "access to and egress

38

from certain wells, gas pipelines and gathering systems, water pipelines, tanks, compressors and other similar oil and gas exploration, production, gathering and transportation equipment and facilities on the lands located in [certain portions of] Colorado." The operator was responsible for the operation and maintenance of the Garden Gulch Road, and the participants to the agreement were responsible for "the costs and expenses necessary to construct, operate, and maintain the [r]oad." The Road Construction and Maintenance Agreement stated that it was governed by Colorado law and each participant to the agreement "expressly consent[ed] to personal jurisdiction of the state and federal courts located in Denver, Colorado, for any lawsuit filed against it arising under the [a]greement." The Road Construction and Maintenance Agreement was binding on the agreement's participants and "their respective successors and assigns."

On appeal, as in the trial court, Terra argues that "[t]here [i]s [s]pecific [j]urisdiction [o]ver Caerus in Texas" because Caerus committed a tort in Texas by making improper deductions of payments and improper charges on invoices sent to Terra in Texas. But merely contracting with a Texas resident does not satisfy the minimum contacts requirement, and jurisdiction is not "justified by the single fact that a contract is payable in Texas." *Blair Comm'ns, Inc. v. SES Survey Equip. Servs., Inc.*, 80 S.W.3d 723, 729 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also Baywater Drilling, LLC v. Ratliff*, No. 01-19-00706-CV, 2020 WL 3422207, at

*6 (Tex. App.—Houston [1st Dist.] June 23, 2020, no pet.) (mem. op.) ("[E]ven a sustained contractual relationship with a Texas resident does not support the exercise of jurisdiction if the contract is centered around the nonresident's operations outside of Texas." (internal quotations omitted)); *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 213 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (contracting with Texas entity and numerous telephone and facsimile communications with people in Texas relating to alleged contract do not establish minimum contacts). Caerus's sending of payments and invoices to Terra in Texas is not determinative of the jurisdictional analysis. *See Riverside Exports, Inc. v. B.R. Crane & Equip., LLC*, 362 S.W.3d 649, 654 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("[S]ending funds to Texas is not determinative." (internal quotations omitted)); *Shell Compañia Argentina de Petroleo, S.A. v. Reef Explor., Inc.*, 84 S.W.3d 830, 839 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("[P]ayments sent to the forum state are not determinative."); *cf. Nance Int'l, Inc. v. OceanMaster Eng'g PTE, Ltd*, No. 01-11-00664-CV, 2012 WL 5381224, at *6 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (mem. op.) ("[T]he contract in this case required some performance by the defendant in Texas beyond mere payment."). Further, although Terra asserts that Caerus committed a tort in Texas because Terra incurred damages or was injured in Texas, "the alleged direction of a tort into Texas is not a valid basis for specific jurisdiction." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 76 (Tex. 2016);

40

*TV Azteca v. Ruiz*, 490 S.W.3d 29, 43 (Tex. 2016) ("[T]he mere fact that [the nonresident defendants] directed defamatory statements at a plaintiff who lives in and allegedly suffered injuries in Texas, without more, does not establish specific jurisdiction over [the nonresident defendants]."); *see also Walden v. Fiore*, 571 U.S. 277, 289–90 (2014) ("[M]ere injury to a forum resident is not a sufficient connection to the forum. . . . The proper question is not where the plaintiff experienced a particular injury but whether the [nonresident] defendant's conduct connects him to the forum in a meaningful way.").

Terra also argues that "[t]here [i]s [s]pecific [j]urisdiction [o]ver Caerus in Texas" because the Gas and Marketing Election Agreement contains a Texas choice-of-law provision. Although a choice-of-law provision may be considered in analyzing personal jurisdiction, "such a provision standing alone [is] insufficient to confer jurisdiction." *Burger King*, 471 U.S. at 482; *see also Schlais v. Valores Corporativos Softtek, S.A. de C.V.*, No. 03-11-00188-CV, 2012 WL 1499488, at *7 (Tex. App.—Austin Apr. 25, 2012, no pet.) (mem. op.) (choice-of-law provision not dispositive); *Syrian-Am. Oil Corp., S.A. v. SSPD Petroleum Dev. B.V.*, No. 01-10-00224-CV, 2011 WL 1328373, at *7 (Tex. App.—Houston [1st Dist.] Feb. 24, 2011, no pet.) (mem. op.) ("The . . . Agreement's provision that beginning in 1989 the . . . Agreement would apply Texas law is not a minimum contact with Texas."). And the choice-of-law provision in the Gas and Marketing Election

Agreement does not indicate a voluntary submission to the personal jurisdiction of Texas's courts "in the absence of any express understanding to that effect."[4] *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 125 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.); *see also Healix Infusion Therapy, Inc. v. S. Fla. Infectious Diseases & Tropical Med. Ctrs., LLC*, No. 01-07-00849-CV, 2008 WL 2854263, at *5 (Tex. App.—Houston [1st Dist.] July 24, 2008, no pet.) (mem. op.) ("[T]he choice-of-Texas-law provision, which states that the contracts shall be 'governed, interpreted, and construed according to the laws of the State of Texas,' does not confer jurisdiction, in the absence of any indication that [the nonresident defendant] intended to voluntarily submit to personal jurisdiction in Texas."). Caerus did not agree in the Gas Marketing and Election Agreement that any dispute under the agreement would be litigated in Texas. *See Internet Advert. Grp., Inc. v. Accudata, Inc.*, 301 S.W.3d 383, 390 (Tex. App.—Dallas 2009, no pet.) ("Although [the nonresident defendant] agreed Texas law would govern the contract, it did not

---

[4]     We note that the parties disagree as to whether the Gas Marketing Election Agreement "is central to Terra's claims in" its suit. But even assuming it is "central," the Texas choice-of-law provision found in the agreement is "insufficient to confer jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985); *see also Schlais v. Valores Corporativos Softtek, S.A. de C.V.*, No. 03-11-00188-CV, 2012 WL 1499488, at *7 (Tex. App.—Austin Apr. 25, 2012, no pet.) (mem. op.) (choice-of-law provision not dispositive); *Syrian-Am. Oil Corp., S.A. v. SSPD Petroleum Dev. B.V.*, No. 01-10-00224-CV, 2011 WL 1328373, at *7 (Tex. App.— Houston [1st Dist.] Feb. 24, 2011, no pet.) (mem. op.) ("The . . . Agreement's provision that beginning in 1989 the . . . Agreement would apply Texas law is not a minimum contact with Texas.").

agree that any dispute arising under the contract would be litigated in Texas nor was there any other evidence to that effect.").

Further, it is clear from Terra's pleadings that the Gas Marketing and Election Agreement is not the only agreement relevant to Terra's claims. And to the extent that Terra wants to rely on a choice-of-law provision, the JOAs and the Road Construction and Maintenance Agreement are governed by Colorado law, with the Road Construction and Maintenance Agreement further providing that each party to the agreement "expressly consent[ed] to personal jurisdiction of the state and federal courts located in Denver, Colorado, for any lawsuit filed against it arising under the [a]greement." The Road Construction and Maintenance Agreement was binding on the agreement's participants and "their respective successors and assigns." *See, e.g.*, *Bogart v. Star Bldg. Sys.*, No. 01-10-00446-CV, 2011 WL 846566, at *3 (Tex. App.—Houston [1st Dist.] Mar. 10, 2011, pet. denied) (mem. op.) ("[A] party can expressly or implicitly consent to personal jurisdiction through a forum selection clause.").

Finally, Terra argues that "[t]here [i]s [s]pecific [j]urisdiction [o]ver Caerus in Texas" because its claims related to the Garden Gulch Road, which is located in Colorado, are purely contractual and "jurisdiction exists in Texas over charges made by Caerus for 'overhead' in its operation of the road." In doing so, Terra relies on *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021).

In *Ford*, the United States Supreme Court considered whether the defendant, Ford Motor Company, a global automobile manufacturer and marketer, was subject to specific jurisdiction in Montana and Minnesota in two products-liability suits. 141 S. Ct. at 1022, 1026. In each case, the resident-plaintiff alleged that a Ford car had caused a collision, resulting in harm, in the forum state. *Id.* at 1022–23. And Ford conceded that it had purposefully availed itself of the forum state—having advertised, sold, and serviced the two car models at issue in each forum state. *Id.* at 1026, 1028. But Ford asserted that specific jurisdiction was lacking in both cases because its activities in the forum states did not give rise to, or cause, the plaintiffs' claims. *Id.* at 1026. That is, it asserted, it did not design, manufacture, or sell the specific cars at issue within the forum states. *Id.* at 1023, 1026. Only later resales and relocations by consumers had brought the cars to the respective forum states. *Id.* at 1022–23.

The United States Supreme Court noted that specific jurisdiction demanded that a suit "arise out of or relate to the [nonresident] defendant's contacts with the forum." *Id.* at 1026 (emphasis and internal quotations omitted). And the phrase "arises out of" involved a causation question, i.e., that the "plaintiff's claim came about because of the [nonresident] defendant's in-state contact." *Id.* (internal quotations omitted). Although the phrase "relate to," "contemplate[d] that some relationship[] [could] support jurisdiction without a causal showing," "[t]hat d[id]

44

not mean anything goes," because the phrase "relate to" "incorporate[d] real limits" to adequately protect nonresident defendants. *Id.* (internal quotations omitted.) According to the Supreme Court, there must still be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place" in the forum. *Id.* at 1031 (alterations in original) (internal quotations omitted).

In *Ford*, the United States Supreme Court ultimately concluded that Ford was subject to specific jurisdiction in Montana and Minnesota, explaining that "[w]hen a company like Ford serves a market for a product in a [s]tate and that product causes injury in the [s]tate to one of its residents, the [s]tate's courts may entertain the resulting suit." *Id.* at 1022. Because Ford had "systematically served a market in Montana and Minnesota for the very [cars] that the plaintiffs allege[d] had malfunctioned and injured them in those [s]tates," there was a "strong relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction." *Id.* at 1028.

We cannot say that the same circumstances that justified the finding of specific jurisdiction over Ford, a global automobile manufacturer and marketer, in Montana and Minnesota—where Ford had advertised, sold, and serviced the two car models at issue in each forum state—are similarly present here. There is no jurisdictional evidence, or any factual allegations, of an "affiliation between the

45

forum and the underlying controversy, principally, [an] activity or occurrence that t[ook] place" in Texas. *Id.* at 1031 (alterations in original) (internal quotations omitted). Further, we cannot say that here there is a "strong relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction." *Id.* at 1028 (internal quotations omitted).

To establish specific jurisdiction, a Texas resident cannot be the only link between a nonresident defendant and Texas. *Ratliff*, 2020 WL 3422207, at *7. Based on the record, we conclude that the jurisdictional evidence negates specific jurisdiction as a basis for personal jurisdiction over Caerus.[5] Thus, we hold that the trial court erred in denying Caerus's second amended special appearance.

We sustain Caerus's sole issue.

---

[5] Because of our conclusion, we need not address any remaining arguments in Caerus's briefing. *See* TEX. R. APP. P. 47.1.

## Conclusion

We reverse the trial court's order denying Caerus's second amended special appearance and render judgment dismissing Terra's suit against Caerus for lack of personal jurisdiction. We dismiss any pending motions as moot.


Julie Countiss
Justice

Panel consists of Justices Goodman, Countiss, and Farris.